**VESTA FIRE INSURANCE CORPORATION,**
**Appellant,**

v.

**NEW CAP REINSURANCE CORPORATION, LIMITED, Appellee.**

**No. 99 Civ. 5713(RWS).**

United States District Court, S.D. New York.

Feb. 7, 2000.

---

Mound, Cotton & Wollan, New York City, by Lawrence S. Greengrass, Michael H. Goldstein, Christina M. Wood, of counsel, for appellant.

Chadbourne & Parke, New York City, by Howard Seife, Jonathan F. Bank, Lisa C. Dorr, of counsel, for appellee.

## OPINION

SWEET, District Judge.

Appellant Vesta Fire Insurance Company ("Vesta") has appealed from an order of the Bankruptcy Court denying its objections to a preliminary injunction, issued pursuant to Section 304 of Title 11 of the United States Code (the "Bankruptcy Code"), staying an arbitration between Vesta and New Cap Reinsurance Corporation Limited ("New Cap"). That preliminary injunction was obtained pursuant to an application by appellee John Gibbons ("Gibbons" or the "Administrator"), the Administrator of New Cap in an Australian insolvency proceeding. For the reasons set forth below, the order is affirmed.

### The Parties

Vesta is an Alabama corporation, and is licensed to do business in New York.

Gibbons is the Administrator of New Cap, a reinsurance company incorporated under the laws of Australia.

### Facts and Prior Proceedings

Vesta and New Cap entered into an agreement of reinsurance (the "Agreement"). Under the explicit terms of that Agreement, any contractual disputes between the parties were to be arbitrated in Birmingham, Alabama.

On October 7, 1998, prior to the initiation of any insolvency proceedings involving New Cap, Vesta demanded arbitration to recover reinsurance proceeds allegedly owed to it by New Cap. A panel was selected, an organizational meeting held, and discovery requests served. On March 24, 1999, the arbitration panel held, at Vesta's request, that New Cap would be required to provide pre-hearing security in

the amount of $12.5 million. When New Cap refused to supply such security, Vesta petitioned to confirm the panel's award in the United States District Court for the Southern District of New York. By order of the Honorable Deborah A. Batts dated May 3, 1999, the petition was dismissed as premature. *See Vesta Fire Ins. Co. v.. New Cap Reins. Corp.*, 99 Civ. 2536(DAB) (S.D.N.Y. May 3, 1999).

However, New Cap's continued financial stability was in serious doubt. On April 21, 1999, Gibbons was appointed as Administrator of New Cap under the Australian Corporations Law, and on April 29, 1999 that appointment was ratified at a meeting of creditors. Under Australian law, a stay of all proceedings against New Cap became effective immediately upon the appointment of the Administrator. Shortly thereafter, an ancillary proceeding under Section 426 of the Companies Act 1985 of England and Wales was commenced in the High Court of Justice in London, and there is presently a stay of all proceedings against New Cap in the United Kingdom. On April 28, 1999, the Administrator commenced an ancillary proceeding in the Bankruptcy Court pursuant to 11 U.S.C. § 304. Following a hearing on May 5, 1999, the Honorable Cornelius Blackshear entered a preliminary injunction with respect to all creditors of New Cap that had not objected to the Administrator's proceeding, and scheduled a hearing on Vesta's objections for May 17, 1999.

On May 17, after considering the parties' briefing and hearing argument from counsel, Judge Blackshear denied Vesta's request that it be exempted from the order staying all proceedings against New Cap, and that it be allowed to continue the arbitration already underway in Alabama. That order, from which Vesta now appeals, was memorialized and formally signed on May 19, 1999 (the "May 19, 1999 order"). Vesta filed its notice of appeal from the May 19, 1999 order on May 27, 1999.

In its papers, Vesta principally contends that (1) the bankruptcy court erred in failing to defer to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "UN Convention"), 9 U.S.C. § 201 et seq.; (2) the bankruptcy court was in error in its view that a foreign debtor's formal compliance with Section 304(c) automatically entitles it to injunctive relief; (3) the arbitration at issue was "unrelated to property of the debtor located in the United States," and was therefore beyond the reach of Section 304; (4) that the bankruptcy court did not weigh properly the criteria governing relief under Section 304; and (5) that Vesta was entitled to relief, under Section 362(d)(1), from the bankruptcy court's stay, just as it would from an automatic stay under Section 362 of the Bankruptcy Code. It presses that the stay of all proceedings, including arbitration proceedings, compromises its bargained-for right to arbitrate in a forum of its choice, and that the arbitration should be allowed to proceed without delay, even if it is not allowed to immediately collect on any arbitral award.

Oral argument was heard on October 6, 1999, at which time the matter was deemed fully submitted.

### Discussion

■ The bankruptcy court's decision under Section 304 to defer to the Australian insolvency proceeding shall be reviewed under an abuse-of-discretion standard. *See In re Treco*, 239 B.R. 36, 40 (S.D.N.Y.1999); *In re Singer*, 205 B.R. 355, 356 (S.D.N.Y.1997); *In re Manning*, 236 B.R. 14, 19 (9th Cir. BAP 1999).

■ Section 304 provides as follows:

(a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.

(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—

(1) enjoin the commencement or continuation of—

(A) any action against—

(i) a debtor with respect to property involved in such foreign proceeding; or

(ii) such property; or

(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;

(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or

(3) order other appropriate relief.

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

As a number of courts and commentators have observed, a petition filed pursuant to Section 304 "does not commence a full and conventional bankruptcy case." 2 Collier on Bankruptcy ¶ 304.03[1] (15th ed.1999); *see In re Manning,* 236 B.R. at 21. As a result, an ancillary proceeding neither creates an "estate" under the Code "nor does it confer on the foreign debtor the full panoply of rights that would otherwise be available to a debtor or trustee under chapters 7, 9, 11, 12 or 13 of the ... [Bankruptcy] Code." *In re Hopewell,* 238 B.R. 25, 54 (Bankr.S.D.N.Y.1999). Instead, a case under that section is " 'a limited one, designed to function in aid of a proceeding pending in a foreign court.' " *In re Davis,* 191 B.R. 577, 582 (Bankr. S.D.N.Y.1996) (*quoting In re Gee,* 53 B.R. 891, 898 (Bankr.S.D.N.Y.1985)). The principal concern of courts applying Section 304 has been to "prevent the piecemeal distribution of assets," and to afford the foreign court an opportunity to "assess where and when claims should be liquidated in order to conserve estate resources and maximize the assets available for distribution." *In re Bird,* 229 B.R. 90, 94 (Bankr.S.D.N.Y.1999); *see In re Koreag,* 961 F.2d 341, 348 (2d Cir.1992). Accordingly, " 'if any philosophy can be attributed to the structure of the Code it is that of deference to the country where the primary insolvency proceeding is located ... and flexible cooperation in administration of assets.' " *In re Hopewell,* 238 B.R. at 54 (*quoting In re Simon,* 153 F.3d 991, 998 (9th Cir.1998), *cert. denied,* 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999)).

As Vesta has correctly observed, Section 304 does afford the bankruptcy court significant discretion. However, the direction of this discretion typically points in favor of granting, not denying, the relief sought by Section 304 petitioners. Indeed, it has been said that Section 304(b) affords a court wide latitude to mold appropriate relief, and that such relief is authorized "in near blank check fashion" so that the jurisdiction entrusted with overseeing an insolvency can proceed in a rational fashion with due regard for all of the varied and competing interests of creditors. *In re Culmer,* 25 B.R. 621, 624 (Bankr.S.D.N.Y. 1982); *see* 2 Collier on Bankruptcy

¶ 304.08 ("This broad application of the section 304(c) factors manifests the legislative intent that bankruptcy courts have the needed discretion to address the tensions between foreign and local creditors and legal interests inherent in every multinational bankruptcy case."); *see also In re Ionica,* 241 B.R. 829, 834 (Bankr.S.D.N.Y. 1999) (noting that Section 304(c) factors "are designed to give the Court maximum flexibility, and permit it to 'make the appropriate orders under all of the circumstances of each case, rather than being provided with inflexible rules.' ") (*quoting* H.R.Rep. No. 95–595, at 324–25 (1977)), U.S.Code Cong. & Admin. News pp. 5963, 6280–6281; *In re Treco,* 239 B.R. at 41 ("This Court agrees with th[e] trend towards granting deference to foreign proceedings, which furthers the purposes of § 304 in promoting efficiency in international bankruptcies and encouraging other countries to defer similarly to U.S. proceedings.").

Of course, to grant relief under Section 304(b) a court must first consider the six factors set forth in Section 304(c). To the extent that an evaluation of the criteria set forth in that section require a court to assess the nature and quality of the foreign insolvency proceeding, and to determine whether the interests of claim holders in the United States will be protected in the same manner as foreign creditors, there is obviously an elastic element to the inquiry. However, there is little question from the record presented that sufficient evidence was presented to Judge Blackshear from which he properly could conclude that relief was warranted under Section 304(b).

■ There is no real dispute as between the parties that a "foreign proceeding," within the meaning of the Bankruptcy Code, has been commenced in Australia, or that the Administrator is a "foreign representative" of New Cap. Furthermore, Vesta has neither seriously contested the bankruptcy court's jurisdiction over the matter under consideration, nor the pro-

priety of venue in this district's bankruptcy court. Though Vesta has asserted that the arbitration at issue is "unrelated to property of the debtor located in the U.S.," and that the relief provided to New Cap was therefore outside the ambit of Section 304's jurisdictional mandate, the presence of debtor-owned property in the United States is not the "sine qua non of bankruptcy court jurisdiction under § 304." *Haarhuis v. Kunnan Enters., Ltd.,* 223 B.R. 252, 254–55 (D.D.C.1998) ("[T]o hold the presence of property in the United States to be a jurisdictional prerequisite under § 304 would diminish much of its usefulness as an adjunct to foreign insolvency proceedings. Foreign representatives might have no interest in protecting a foreign debtor's U.S. assets of negligible value, yet be vitally concerned with defending the corpus of a foreign debtor's estate abroad against a U.S. judgment that would likely be given recognition in the foreign proceeding."), *aff'd,* 177 F.3d 1007 (D.C.Cir.1999); *see In re Manning,* 236 B.R. at 20 ("Clearly, Congress wanted the bankruptcy courts of the United States, subject to certain guidelines, to recognize the primary interests of a foreign proceeding to administer property involved in that proceeding. This policy of comity for foreign proceedings is not dependant on property of the foreign debtor existing in the United States."); *In re Gercke,* 122 B.R. 621, 625 (Bankr.D.D.C.1991) ("York argues unpersuasively that the focus of 11 U.S.C. § 304 is with actions against a debtor's assets in the United States, not with an action by an unsecured creditor simply to reduce a claim to judgment.").

■ Judge Blackshear was not presented with any evidence suggesting that the interests of Vesta would be treated differently from those of similarly-situated claimants, whether they be from Australia or beyond, or that the insolvency proceedings in Australia were sufficiently dissimilar from those in the United States as to preclude relief under Section 304. Neither was he presented with any evidence

casting doubt on Vesta's ability to seek redress of its grievances and to protect its interests in the Australian courts, or to receive the due process it assuredly deserves. To the contrary, he was presented with evidence indicating that the insolvency proceedings in Australia imposed a stay on all creditor actions in the absence of permission by the Administrator, and that, while "voluntary administration" under Australian law did not necessarily demand automatic judicial intervention, judicial oversight was certainly available upon request to protect the disparate interests of creditors. It is well settled that a foreign bankruptcy scheme need not be identical to our own before proceedings under that scheme may be deferred to, and it is only necessary under Section 304(c) that the legal regime in place be "substantially in accordance" with that which we employ. *In re Brierley,*, 145 B.R. 151, 167 (Bankr. S.D.N.Y.1992); *see Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.1993) ("Contrary to appellants' assertions … there is no requirement that Australian liquidation proceedings be identical to United States bankruptcy proceedings.…What is important is that Australian law provides a stay procedure to centralize all claims and 'enable[ ] the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner.' ") (*quoting Cunard Steamship Co. v. Salen Reefer Servs. A.B.,* 773 F.2d 452, 458 (2d Cir.1985)); *In re Treco,* 239 B.R. at 41 ("Section 304(c)(4), however, 'does not command that the distributive scheme wholly replicate ours.' In fact, prior U.S. courts have already concluded that the distribution scheme of the Bahamas, 'a sister common law jurisdiction,' is fundamentally fair and generally satisfies the standard set forth in § 394(c)(4).") (*quoting In re Brierley,* 145 B.R. at 167; *In re Culmer,* 25 B.R. at 629–32). Though admittedly not controlling given the fact-specific nature of the bankruptcy court's Section 304 inquiry, it is worth noting in this regard that Australian insolvency proceedings have already been found by the Second Circuit to be entitled to comity. *See Allstate Life Ins.,* 994 F.2d at 999–1000. Courts have also repeatedly found the bankruptcy proceedings of other nations with common law and statutory legal regimes fundamentally similar to our own to be entitled to similar deference. *See In re Ionica,* 241 B.R. at 835 (British insolvency proceedings); *In re Manning,* 236 B.R. at 24 (same).

■ The essence of Vesta's position is that affording the Administrator the relief sought was, nevertheless, inappropriate, as it had a bargained-for right to arbitrate. Vesta posits that it should not be called upon to press its claims in Australia when it has a clear right to arbitrate in Alabama. Recognizing that recovery of any damages awarded by the appointed panel would be problematic, however, Vesta concedes that it is willing to refrain from collection.

As an initial observation, the maintenance of a vigorous defense in the Alabama arbitration will obviously have its costs, in terms of attorneys' fees and the like. While Vesta minimizes both the amount and the importance of this expense, it is apparent that the funds for such a defense are themselves part of the common fisc ultimately available to the Australian court for distribution. The security payment required by the panel in March of 1999 presents a more troubling problem. Functionally, the payment of such security will transform Vesta from an unsecured creditor into a secured creditor—a practical consideration of not insubstantial consequence.

Furthermore, as the Administrator notes, Vesta is not alone among New Cap's creditors in possessing contractual arbitration rights. While Vesta makes much of the fact that only a few claimants have joined it in opposing injunctive relief, others may well do so in the future.[1] Wheth-

---

1. As the Honorable Tina L. Brozman, Chief Judge of the Bankruptcy Court for the South-

ern District of New York, noted in *In re Hope-well,* 238 B.R. at 25, the possibility that other

er they will or will not, however, the *reductio* invoked by the Administrator identifies a fundamental problem with Vesta's position. Allowing Vesta an opportunity to arbitrate without any regard for the Australian proceeding leaves little principled reason to deny similar relief to other creditors and claimants.

Vesta is correct that both the U.N. Convention and the Arbitration Act call for the recognition and enforcement of valid arbitration agreements, and it is not alone in its observation that courts have expressed a strong affinity for the enforcement of international arbitration agreements. *See In re United States Lines, Inc.,* 197 F.3d 631, 639 (2d Cir.1999). Such agreements, as with the agreement at issue in the instant action, allow participants in complex and often confusing international arrangements to ensure that their disputes will be handled by those with the requisite experience and knowledge. It can hardly be expected, for example, that a bankruptcy court in Australia or the United States would have the same level of reinsurance-related expertise as a specialized panel of reinsurance arbitrators.

■ This being said, however, it is well-settled that the provisions of the U.N. Convention do not demand greater fidelity in our courts than the statutory regime through which they were incorporated into the fabric of our domestic law. *See Stephens v. American Int'l Ins. Co.,* 66 F.3d 41, 45 (2d Cir.1995) (noting that "the Convention is not self-executing, and therefore, relies upon an Act of Congress for its implementation") (*citing* 9 U.S.C. § 201–08). Moreover, when a dispute involving both the Bankruptcy Code and the Arbitration Act "presents a conflict of near polar extremes," with bankruptcy policy "pull[ing] towards centralization while arbitration policy advocates a decentralized approach towards dispute resolution," it is

the Bankruptcy Code that has often carried the day—even where international arbitration agreements are compromised. *See In re U.S. Lines,* 197 F.3d at 640–41 (holding that conflict between Bankruptcy Code and statutes favoring arbitration may be sufficient to "override by implication the presumption in favor of arbitration," and finding that United States bankruptcy court supervising Chapter 11 insolvency did not err in refusing to refer proceedings to arbitration).

■ Though the Second Circuit did not explicitly address the U.N. Convention or its enabling legislation in *Cunard Steamship Co. v. Salen Reefer Servs. A.B.,* 773 F.2d 452 (2d Cir.1985), the circumstances of that case were similar to those of the case at bar, and the logic of that decision applies here. In this conflict between the Bankruptcy Code and the statutory regime governing arbitration, it is the Bankruptcy Code that prevails.

In *Cunard,* as in the instant case, a domestic creditor sought to enforce its bargained-for rights to arbitration as against a corporation insolvent under the laws of a foreign nation. Cunard, the plaintiff in that case, obtained an order of attachment based on a contract claim, and pressed its rights under the terms of the contract at issue to arbitrate that claim in London. *See id.* at 454. Upon motion by the defendant Salen, an insolvent corporation administered under the laws of Sweden, this Court ordered that the attachment be vacated on comity grounds. On appeal, Cunard contended, *inter alia,* that the district court's vacatur of the attachment compromised Salen's right to arbitrate, in contravention of both state and federal public policy in favor of arbitration. *See Cunard,* 773 F.2d at 459.

The Court of Appeals affirmed, holding on comity grounds[2] that deference was

creditors will follow the lead of a creditor successful in carving out an exception to a stay of domestic proceedings is a matter of real concern. *See id.* at 67.

2. Because of the procedural posture of the case, the district court's decision was not premised upon Section 304, but rather general principles of comity. However, the *Cunard*

appropriately given to the Swedish proceeding. As the court explained:

> The rationale underlying the granting of comity to a final foreign judgment is that litigation should end after the parties have had a fair opportunity to present their cases fully and fairly to a court of competent jurisdiction. The extending of comity to a foreign bankruptcy proceeding, by staying or enjoining the commencement *or continuation* of an action against a debtor or its property, has a somewhat different rationale. The granting of comity to a foreign bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly, and systematic manner, rather than in a haphazard, erratic or piecemeal fashion. Consequently, American courts have consistently recognized the interest of foreign courts in liquidating or winding up the affairs of their own domestic business entities.

*Id.* at 457–48 (emphasis added). More importantly insofar as Vesta's claims concerning arbitration are concerned, the *Cunard* court remarked that "there is ... no compelling policy reason for a general creditor whose claim is subject to arbitration to receive a preference over other creditors." *Id.* at 459.

Subsequent decisions have only reinforced *Cunard*'s essential holding that a United States court may defer to a foreign bankruptcy proceeding, even where a domestic creditor claims an entitlement to arbitration. *See In re Hopewell,* 238 B.R. at 63–64 (rejecting creditor's claim of unfettered entitlement to arbitration under Arbitration Act and U.N. Convention, observing that "bankruptcy sometimes causes changes in contractual rights necessary to benefit the estate as a whole," and that "as Cunard demonstrates, the admittedly strong policy favoring arbitration

is not as sacrosanct as [creditors] urge"); *Allstate Ins. Co. v. Hughes,* 174 B.R. 884, 891 (S.D.N.Y.1994) ("Allstate is mistaken to the extent that it claims that the Convention and the FAA afford parties to an arbitration agreement rights superior to parties to contracts without such a clause. The right to litigate is no less a substantial right than the contractual right to arbitrate, as the Second Circuit pointed out in *Cunard* ....The purpose of the FAA was not to elevate arbitration rights over litigation rights, but rather to revers[e] centuries of judicial hostility to arbitration agreements, ... and to place arbitration agreements 'upon the same footing as other contracts.' ") (*quoting Scherk v. Alberto Culver Co.,* 417 U.S. 506, 510–11, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)); *Victrix Steamship v. Salen Dry Cargo A.B.,* 65 B.R. 466, 468 (S.D.N.Y.1986) (noting, in case where bankruptcy proceeding was commenced in Sweden against defendant and plaintiff attempted to confirm London arbitration award, that "if the English court had not entered a judgment against Salen, this case would be indistinguishable from Cunard Steamship ... and defendant's motion could be granted summarily"; deferring to Swedish bankruptcy proceedings where arbitration completed and arbitral award issued in favor of creditor), *aff'd,* 825 F.2d 709 (2d Cir.1987); *c.f. In re Springer–Penguin, Inc.,* 74 B.R. 879, 884 (Bkrtcy.S.D.N.Y.1987) ("Generally, bankruptcy jurisdiction is favored rather than allowing claims against a debtor to be determined in arbitration proceedings, even when the bankruptcy case is in a foreign country and the arbitration proceeding is pending in this country....") (*citing Cunard,* 773 F.2d at 458). Moreover, a review of applicable caselaw reveals that deference similar to that granted to the Australian proceeding in this case has

---

court indicated that Section 304's inclusion of a comity criterion did not mean that Section 304 was the exclusive remedy for a representative of a bankrupt wishing to enjoin creditor actions in the United States. *See Cunard,* 773 F.2d at 456.

Though the Cunard decision was premised on general principles of international comity, its discussion of those principles is nevertheless frequently repeated in connection with Section 304 petitions.

been granted to foreign insolvency proceedings despite the existence of operative forum selection or choice-of-law clauses. *See Allstate Life Ins.*, 994 F.2d at 1000; *In re Treco*, 239 B.R. at 43; *Kenner Prods. Co. v. Societe Fonciere et Financiere Agache–Willot*, 532 F.Supp. 478, 479–80 (S.D.N.Y.1982); *In re Gercke*, 122 B.R. at 632; *Cornfeld v. Investors Overseas Servs., Ltd.*, 471 F.Supp. 1255, 1261–62 (S.D.N.Y.), *aff'd*, 614 F.2d 1286 (2d Cir. 1979). Such clauses are no less bargained-for than the arbitration rights asserted by Vesta.

■ Vesta is correct that *Cunard* involved an arbitration that had yet to formally commence, and that the arbitration at issue in the case at bar had already begun at the time of the Administrator's appointment. Setting aside the fact that the Alabama arbitration was only in its incipient stages at the time of the bankruptcy court's injunction, and that no actual discovery had been completed,[3] this is a distinction of form and not substance. After all, if Vesta was in fact entitled to arbitration in the absolutist way that it claims, then it would presumably be entitled to such arbitration even had that arbitration not yet begun. However, as *Cunard* and its progeny indicate, Vesta is not so-entitled in the context of transnational bankruptcies, and it is difficult to divine any principled reason why Vesta's formal rights to arbitrate would be any greater

under the Arbitration Act or the U.N. Convention after commencement of proceedings.[4]

■ Insofar as the inconvenience inherent in participation in an Australian insolvency proceeding is concerned, courts have routinely rebuffed the claims of creditors that the inconvenience necessarily attendant to litigation in a foreign forum—setting aside the particulars of the forum's legal regime—constitutes grounds for rejection of a Section 304 petition. *See In re Brierley*, 145 B.R. at 163; *In re Manning*, 236 B.R. at 24. Foreign creditors are, as a matter of course, required to litigate in our courts if they wish to partake of a domestic debtor's estate, and it is "difficult to label as so prejudicial and inconvenient to U.S. creditors as to warrant denial of injunctive relief that which we require of foreign creditors in our own cases." *In re Brierley*, 145 B.R. at 163. Additionally, while New Cap's potential insolvency and the ramifications flowing therefrom presumably did not loom large in the minds of the Agreement's parties at the time of signing, by doing business with an Australian corporation Vesta implicitly subjected itself to that nation's bankruptcy law in the event of New Cap's insolvency. As the Honorable Burton R. Lifland explained in *In re Culmer*:

> "[E]very person who deals with a foreign corporation impliedly subjects

**3.** The record indicates that a panel was selected, an initial meeting was held, and that discovery requests were served. However, as Vesta acknowledged to Judge Blackshear, actual discovery material had yet to be exchanged between the parties.

**4.** Courts have routinely stayed pending litigation in response to Section 304 petitions or other bankruptcy proceedings. *See In re Manning*, 236 B.R. at 18, 22–24; *In re Rukavina*, 227 B.R. 234, 241 (Bankr.S.D.N.Y. 1998). Moreover, Section 304(b) itself explicitly provides that a court may enjoin the "continuation" of any action. 11 U.S.C. § 304(b)(1).

To the extent that the Second Circuit's decision in *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512 (2d Cir.1975) could be taken to

draw a distinction between arbitrations commenced prior to and after the filing of bankruptcy, such an interpretation would be in error. As this Court observed in *Cunard*, 49 B.R. at 618, the real issue in *Fotochrome* "was an American court's recognition of the validity of a foreign arbitration where the foreign arbitrator had refused to recognize the American court's declaration that the American corporation was bankrupt." *Id.* The question in that case was whether a United States court could stay a foreign arbitration where it had no personal jurisdiction over the foreign party, and the stay was issued due to the insolvency of an American—rather than a foreign—corporation. *See Fotochrome*, 517 F.2d at 514, 516–17.

himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of the government authorizes.... He is conclusively presumed to have contracted with a view to such laws of that government...." Thus, ... [the] creditor's rights are subject to foreign laws and [every creditor] must be required to pursue its remedies in the [foreign] liquidation. One who invests in a foreign corporation subjects his investment to foreign law and may not seek to obtain greater rights than his co-creditors by suing in an American court.

25 B.R. at 632 (*quoting Canada So. Railway v. Gebhard*, 109 U.S. 527, 537, 3 S.Ct. 363, 27 L.Ed. 1020 (1883)); *In re Treco*, 239 B.R. at 43. Though Vesta may well have bargained for its right to resolve its dispute with New Cap in a particular manner and forum, it therefore cannot seriously contend that forcing it to articulate and protect those rights in an Australian proceeding would be unduly burdensome or prejudicial. In short, Vesta must make its case for continuation of the arbitration to an Australian court, and it cannot be heard to complain about doing so.

 Vesta's avowed willingness to forego collection of any judgment rendered in connection with the arbitration at issue does nothing to bolster its position. First, as noted earlier, to even participate in the arbitration the Administrator must expend funds, and the requirement of a security payment has the practical effect of transforming Vesta from an unsecured into a secured creditor. Second, and just as important, allowing Vesta to proceed to judgment would be to allow it to improve its position with respect to other creditors. *See In re Manning*, 236 B.R. at 23 (Had Esteve been permitted to proceed to judgment, it could have improved its position vis-a-vis other unsecured creditors, thereby potentially disrupting the orderly reconciliation of claims and the fair distribu-

tion of assets in the British insolvency proceeding.); *In re Gercke*, 122 B.R. at 626–27 ("York has disavowed any attempt to seize assets of Dominion in the United States. However, fixing the amount of York's claim in the Superior Court would affect the amount of the claim allowable against the property involved in the United Kingdom insolvency proceeding...."); *see also In re Brierley*, 145 B.R. at 168 (indicating "full accord" with *In re Gercke* court's analysis).

This is not to say that Vesta's contentions concerning the significance of its bargained-for rights to arbitration are not well-taken. Were a domestic bankruptcy court supervising New Cap's insolvency, it might well exercise its discretion to order continuation of the Alabama arbitration. *See In re Manshul Construction Corp.*, 225 B.R. 41, 48 (Bankr.S.D.N.Y.1998) (rejecting contention that bankruptcy court should exercise discretion against enforcement of arbitration agreement, and finding that arbitration was most desirable way to resolve fee dispute between defendants and former attorneys); *In re Berman Enters., Inc.*, 168 B.R. 18, 22 (Bankr.E.D.N.Y. 1992) (holding that dispute involving Chapter 11 debtor should be resolved by arbitration; noting that "[a]lthough bankruptcy courts have the discretion to refuse to enforce an arbitration agreement, it must first be demonstrated that a specific conflict exists between enforcing an arbitration clause and the provision and purposes of the Bankruptcy Code," and that no such conflict had been demonstrated). *But see In re U.S. Lines*, 197 F.3d at 639–40 (reversing district court's determination that bankruptcy court erred in failing to refer proceeding to arbitration; noting that bankruptcy court's exercise of discretion required it to "carefully determine whether any underlying purpose of the Bankruptcy Code would be adversely affected by enforcing an arbitration clause") (citation omitted); *In re Spectrum Info. Techs.*, 183 B.R. 360, 363–65 (Bankr.E.D.N.Y. 1995) (denying petitioner relief from automatic stay to commence arbitration, hold-

ing that "notwithstanding the strong federal policy favoring arbitration, the District Courts and the Bankruptcy Courts within the Second Circuit have historically found, especially with respect to core proceedings, that arbitration should not triumph over the specific jurisdiction bestowed upon the bankruptcy courts under the Bankruptcy Code").

However, in the context of the instant insolvency those arguments and the difficult questions they raise are more appropriately put to the Administrator or an Australian court entrusted with the task of supervising New Cap's insolvency. The record does not indicate the priority to be accorded to any arbitral award favoring Vesta, what New Cap's existing liabilities are, or the nature of Vesta's status vis-a-vis other New Cap creditors. As a result, it is impossible to even say with any degree of certainty that Vesta would be entitled to anything at the end of the day should New Cap be liquidated *in toto*. *C.f. In re Treco*, 239 B.R. at 43 (holding that bankruptcy court's granting of relief under Section 304 did not constitute Fifth Amendment taking, and that "[t]he bankruptcy court can hardly be required to provide 'adequate protection' for an interest that is not entitled to first priority under the applicable bankruptcy law."). As Vesta has itself noted, however, Australia too is a signatory to the U.N. Convention, and there is no reason apparent from the record to believe that an Australian court would not give Vesta a fair opportunity to make its case for the continuation of the arbitration should it ultimately be entitled to a distribution.

 Finally, Vesta has suggested that because injunctive relief provided in connection with Section 304 is akin to the protection afforded by the automatic stay applicable to domestic bankruptcies under Section 362(a), Judge Blackshear erred in failing to consider whether Vesta was entitled to relief from the stay under Section 362(d)(1). It is true that such relief is analogous, in many respects, to that provided by the automatic stay, in that the essential purpose of both is the same—repose from creditors, protection of creditors from each other, and maintenance of an orderly liquidation or administration of the estate. *See In re Bird*, 229 B.R. at 94. However, as Chief Judge Brozman recently observed in *In re Bird*, the critical differences between a domestic bankruptcy proceeding and an ancillary proceeding become apparent when one considers both the purposes of a stay and the proper locus of transnational bankruptcy decision-making:

> The purposes of the automatic stay, to preserve the assets of the debtor for the benefit of all creditors and to protect the creditors from each other by stopping the race to seize the debtors assets, are not advanced by disallowing suits against the debtor in the court where the bankruptcy case is pending. In fact, the opposite is true. Having such litigation go forward in what can be termed the home court centralizes all actions against the debtor in one forum under the control of one court and thereby aids the home court in protecting the debtor and creditors and in efficiently administering the estate . . . . .

> Whereas §§ 362 and 304 perform similar functions in protecting the debtor from his or her creditors, as with many analogies, there is a danger in expanding the analogy to an equation, for my function in a domestic bankruptcy case is quite different from my function in an ancillary one. Were this a traditional chapter 7 or 11 proceeding, I would be empowered to administer North Atlantic's estate. . . . However, in the context of an ancillary proceeding, I do not determine the extent or validity of claims against the estate; proofs of claim are not even filed in this court. The administration of the debtor's estate, as a whole, is not within my province, for I am not the home court; the main proceeding is in the United Kingdom. It would offend principles of comity for me

to decide, in lieu of the English court, whether the claims which Northwestern and Armco seek to assert would unduly interfere with the provisional liquidation and the court proceedings which likely would follow it.

229 B.R. at 95–96. A proceeding pursuant to Section 304 does not call for a bankruptcy court to make any determination of the debtor's property interests. *See In re Manning,* 236 B.R. at 21 (*citing In re Brierley,* 145 B.R. at 168). Neither does it call for the domestic bankruptcy court to make any determination concerning the timing of liquidation, or the manner in which the validity of creditors' claims are to be assessed. As a result, while a bankruptcy court supervising a domestic insolvency may well be expected, in the exercise of discretion, to allow a creditor seeking to commence or continue an arbitration relief from an automatic stay,[5] the considerations involved in granting an exception from a Section 304(b) injunction are markedly different.

 Judge Blackshear was presented with ample evidence from which it could be concluded that relief should be provided to the Administrator under Section 304, and Vesta's only claim to preferential treatment was premised upon the existence of an arbitration clause in its reinsurance agreement with New Cap. Tellingly, when pressed by Judge Blackshear to indicate how it was different from any other creditors with arbitration clauses in their contracts, Vesta was unable to do so.[6] Moreover, merely because the arbitration at issue was already underway at the time of the Administrator's appointment did not demand an exception to the injunction.

---

5. In its briefing materials, Vesta has cited several cases in which arbitration was allowed to proceed under such circumstances. However, while such cases make clear that the interests a potential judgment creditor has in arbitrating its claim(s) may be significant, they are inapposite. Where a bankruptcy court allows arbitration against a debtor under its supervision, that court is nevertheless able to coordinate the claims of the arbitrating creditor with those of other creditors. In

Pending litigation has been stayed frequently in the context of Section 304 proceedings, and, as explained above, there is no reason why a pending arbitration in its initial stages should be treated any differently.

Judge Blackshear was thus well within the confines of his discretion when he refused to grant Vesta an exception to the May 5, 1999 injunction.

*Conclusion*

For the reasons set forth above, the May 19, 1999 order appealed from shall be affirmed.

---

the context of transnational bankruptcies, however, such supervision and coordination by the United States bankruptcy court is conspicuously absent.

6. More specifically, counsel to Vesta responded that "[w]e have an arbitration clause in our contract and we have a pending arbitration."