In re Petition of **BOARD OF DIRECTORS OF HOPEWELL INTERNATIONAL INSURANCE LTD., as Scheme Administrators of Hopewell International Insurance Ltd., Debtor in Foreign Proceedings.**

No. 99 Civ. 11470(DC).

United States District Court,
S.D. New York.

March 29, 2002.

---

---

Cozen and O'Connor, By Stephen A. Cozen, Richard M. Mackowsky, Neal D. Colton, David M. Doret, Ellen M. Spindler, Philadelphia, PA and New York City, for Gold Medal.

Seward & Kissel, LLP, By Ronald L. Cohen, Mark D. Kotwick, Charles M. Miller, New York City, Zelle, Hofmann, Voelbel & Gette, LLP, By Lawrence Zelle, Lawrence T. Hofman, Richard L. Voelbel, Minneapolis, MN, for General Mills.

Chadbourne & Parke, LLP, By Howard Seife, Marjorie L. Cohen, Lisa C. Dorr, Andrew Rosenblatt, New York City, for Hopewell.

### MEMORANDUM DECISION

CHIN, District Judge.

This is an appeal from an order of the Bankruptcy Court for the Southern District of New York granting the petition of the Board of Directors of Hopewell International Insurance Ltd. ("Hopewell") pursuant to § 304 of the Bankruptcy Code for recognition of a "Scheme of Arrangement" entered into under Bermuda law. The Bankruptcy Court held that the scheme and an injunction issued by a Bermuda court to enforce the scheme were entitled to full force and credit in the United States. Two creditors, Gold Medal Insurance Company ("Gold Medal") and General Mills, Inc. ("General Mills") appeal. For the reasons set forth below, the order of the Bankruptcy Court is affirmed.

### FACTS

#### A. Background

Hopewell is a Bermuda company that provides reinsurance for "captive insurers." A captive insurer provides insurance only for its parent company and the parent's other subsidiaries. Typically, a captive insurer has few assets and employees and reinsures its risks with a reinsurer.

Gold Medal is the captive insurer of General Mills. Gold Medal reinsured its risk with Hopewell pursuant to a reinsurance agreement dated November 16, 1992 (the "Reinsurance Agreement"). In turn, Hopewell limited its risk through a pool of reinsurance agreements (the "Hopewell Treaties"). The Reinsurance Agreement provided for the arbitration of all disputes in Minneapolis, Minnesota, under Minnesota substantive and procedural law.

#### B. The Pesticide Claims

In 1994, General Mills suffered extensive losses when certain oats were treated with a non-FDA approved pesticide. General Mills filed claims for insurance coverage with Gold Medal (the "Pesticide Claims"). Gold Medal initially denied coverage, but eventually submitted the claims to arbitration in Minnesota. Hopewell did not participate in the defense of the claims, and instead informed Gold Medal that it would not be bound by any settlement between General Mills and Gold Medal based on the arbitration.

In November 1999, a Minnesota arbitrator ruled in favor of General Mills and found that the Gold Medal policies covered almost all of the Pesticide Claims. If coverage exists, Gold Medal and General Mills agree that the amount of the loss would be $168 million.

## C.  *The Scheme*

Although Hopewell specialized in property reinsurance, it also provided casualty insurance in the 1970s.  It incurred liability for substantial losses as a result.  The 1987 Pampa vapor cloud explosion, for example, resulted in a $500 million loss.  Hopewell began to have difficulty obtaining reinsurance.  In 1994, Hopewell began to explore the possibility of a run-off—pursuant to which it would cease assuming new risks and it would wind-down existing business.  Hopewell contends that it began considering a run-off before it learned of the Pesticide Claims, but Gold Medal contends otherwise.  In late 1994 or early 1995, Hopewell decided to go into a run-off, even though it was still solvent.

In early 1995, Hopewell decided to adopt a "scheme of arrangement," a procedure that would require its creditors to estimate and file claims.  Under Bermuda law, a scheme of arrangement is a contractual adjustment of rights between a company and its creditors or shareholders; it is not a liquidation or reorganization. Although schemes of arrangement are most often used in conjunction with insolvent run-offs, Hopewell was solvent.  Hopewell contemplated using a scheme not to distribute Hopewell's assets to its creditors, but to pay creditors the amounts due from retrocessionaires.  Hopewell's board of directors approved the drafting of a scheme of arrangement on March 28, 1995.

On May 25, 1995, Hopewell, through its attorney, John Kawaley, initiated the scheme process by seeking leave of the Bermuda Supreme Court to convene the requisite creditors' meeting for approval of a scheme of arrangement (the "Scheme"). After a presentation by counsel, the court signed an order approving the notices, proxy forms, claims valuation, and procedures for voting.  Under Bermuda law, the Scheme had to be approved by a majority of the creditors representing more than 75% of the value of actual and contingent claims represented at a statutorily prescribed meeting.

Hopewell divided its creditors into two classes: creditors with liquidated claims who would be paid in full without delay, and creditors with unliquidated claims who would receive payment only to the extent of available assets.  Despite their huge potential exposure, the Pesticide Claims were assigned a voting weight of zero because Gold Medal had not submitted a claim to Hopewell for that loss.  Gold Medal received the Scheme Explanatory Statement on May 26, 1995, less than a month before the creditors meeting.  Gold Medal claims that Walsh, the claims manager for Hopewell, assured Gold Medal that the enactment of the Scheme would not alter the handling of the Pesticide Claims.  Although this is disputed, the Bankruptcy Court found that at the June 23, 1995 creditors' meeting, Gold Medal voted to approve the Hopewell Scheme through its proxy John Deters.  Gold Medal and General Mills claim that Deters abstained.  No dissenting votes were recorded.

On June 23, 1995, the same day as the creditors' meeting, counsel for Hopewell filed a petition with the Bermuda Supreme Court for approval of the Scheme.  On June 29, 1995, the court held a hearing. Although creditors had the right to attend and object to the Scheme, no creditor objected.  At the end of the hearing, the court signed an order approving the Scheme.  On June 30, 1995, Hopewell stopped writing new agreements and began its run-off.

Under the Scheme, creditors had to give notice of all claims, whether liquidated or not, by June 30, 1999.  The Scheme also provided that all disputes were to be submitted to binding arbitration in Bermuda under Bermuda law, notwithstanding any

pre-existing arbitration provisions contained in Hopewell's reinsurance agreements.

## D. *The Bermuda Injunction*

At some point in 1998, Gold Medal threatened to sue Hopewell in Minnesota to compel Hopewell to abide by any settlement Gold Medal reached with General Mills. In response, Hopewell sought and obtained, on July 27, 1998, an *ex parte* order from the Bermuda court enjoining Gold Medal from commencing any action inconsistent with the scheme in any court throughout the world (the "Bermuda injunction"). The Bermuda injunction expressly permitted Gold Medal to challenge the injunction upon giving Hopewell seven days notice.

## E. *Hopewell's Petition*

On July 30, 1998, the Board of Directors (the "Board") of Hopewell filed this petition under § 304 in the Bankruptcy Court, alleging that this case was ancillary to a foreign proceeding. The petition sought emergency relief enjoining Gold Medal and all other creditors from commencing any action or arbitration inconsistent with the Scheme in the United States. In addition, Hopewell sought an order granting comity to and enforcing the Bermuda injunction.[1]

The Bankruptcy Court (Brozman, J.) held an eight-day trial. General Mills argued that venue in the Southern District of New York was improper. It argued that the court should allow Gold Medal to pursue its arbitration in Minnesota. General Mills further argued that if arbitration resulted in an award in favor of Gold Medal, the Scheme could govern the timing and amount of payment.[2]

In a lengthy and thorough opinion, the Bankruptcy Court granted Hopewell's petition. *In re Hopewell Int'l Ins. Ltd.,* 238 B.R. 25 (Bankr.S.D.N.Y.1999). It entered an order giving full force and effect to the Scheme, permanently enjoining all creditors covered by the Scheme from taking action inconsistent with the Scheme, and giving full force and effect to the Bermuda injunction.

These appeals followed.

## *DISCUSSION*

I address (a) the standard of review on appeal, (b) venue, and (c) the merits.

## A. *Standard of Review*

■■■ On appeal from an order of the bankruptcy court, the district court reviews conclusions of law de novo. *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir.1990). This standard of review applies to matters of statutory interpretation. *See In re Treco,* 240 F.3d 148, 155 (2d Cir.2001). The bankruptcy court's decision to defer to a foreign proceeding under § 304(c) is reviewed for abuse of discretion. *See id.; see also Vesta Fire Ins. Corp. v. New Cap Reinsurance Corp.,* 244 B.R. 209, 212 (S.D.N.Y. 2000) ("The bankruptcy court's decision

---

1. General Mills was allowed to intervene by the Bankruptcy Court. All creditors were given notice of the proposed nationwide injunction, but none except Gold Medal appeared. 238 B.R. at 31 n. 2.

2. Gold Medal's desire to avoid arbitration in Bermuda is understandable. Under the traditional "follow the settlements" doctrine, a reinsurer must abide by the resolution of claims against the reinsured carrier, absent fraud, collusion, or bad faith. The British courts, however, have held that a clause similar to that contained in Gold Medal's reinsurance contract was not a "follow the settlements clause." *See* 238 B.R. at 65. If Gold Medal is required to arbitrate in Bermuda, Hopewell would thus have support for its argument that it was not bound by the Minnesota arbitration decision holding Gold Medal responsible for General Mills' losses.

under Section 304 to defer to [a foreign proceeding] shall be reviewed under an abuse-of-discretion standard."), *aff'd, In re McKenna,* 238 F.3d 186 (2d Cir.2001); *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 999 (2d Cir.) ("since the extension or denial of comity [to a foreign proceeding] is within the court's discretion, [the Court of Appeals] will reverse the [district] court's decision only when [it] find[s] an abuse of discretion") (citations omitted), *cert. denied,* 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993).

■ The district court must accept the bankruptcy court's findings of fact, unless such findings are clearly erroneous; "due regard must be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Fed. R. Bankr.P. 8013.

**B. *Venue***

■ The venue requirements for cases brought under 11 U.S.C. § 304 are set forth in 28 U.S.C. § 1410, which contains three subsections. Subsection (b) applies only to cases seeking to enjoin the enforcement of a lien or to require the turnover of property, and the parties agree it does not apply here. Hence, the relevant choices are subsections (a) and (c).

Subsection (a) provides in pertinent part:

> A case under section 304 of title 11 to enjoin the commencement or continuation of an action or proceeding in a State or Federal court ... may be commenced only in the district court for the district where the State or Federal court sits in which is pending the action or proceeding against which the injunction is sought.

28 U.S.C. § 1410(a).

Subsection (c) provides:

> A case under section 304 of title 11, other than a case specified in subsection (a) or (b) of this section, may be com-

menced only in the district court for the district in which is located the principal place of business in the United States, or the principal assets in the United States, of the estate that is the subject of such case.

28 U.S.C. § 1410(c). Hence, if subsection (a) does not apply in this case, subsection (c) controls.

Hopewell filed its petition in this District to enjoin Gold Medal and all other creditors from commencing or pursuing any actions or proceedings, including arbitrations, against it anywhere in the United States. No such action or proceeding had been commenced or was pending when Hopewell filed its § 304 petition. Hopewell contends that the case was properly filed in this District pursuant to § 1410(c) because Hopewell's principal assets in the United States are located here.

Gold Medal and General Mills argue that subsection (a) applies and that the petition should have been filed in Minnesota, because that is where Gold Medal threatened to sue. Indeed, General Mills argues that § 1410(a) applies because Minnesota is the only jurisdiction where Gold Medal could have initiated an arbitration proceeding against Hopewell under the Reinsurance Agreement. (*See* General Mills Br. at 50).

The Bankruptcy Court rejected the arguments of General Mills and Gold Medal and held that subsection (c) controls. I affirm.

First, the venue statute is ambiguous. Subsection (a) is poorly worded and consequently is unclear. It consists of one long sentence and starts by referring to a case brought to enjoin the "commencement or continuation" of an "action or proceeding." That language suggests that the subsection covers actions or proceedings that have not yet been commenced. Yet, the sentence concludes by referring to the dis-

trict "in which is *pending* the action or proceeding against which the injunction is sought." (emphasis added). Hence, the latter part of the sentence appears to contemplate enjoining only actions or proceedings already "pending." The problem, of course, is that it is impossible to file a petition to enjoin the *commencement* of an action in the district in which the action is already *pending*. *See* William Bassin, *Comment, Where Do I Go for Help? The Debtor's Plight for Proper Venue in Cases Ancillary to a Foreign Proceeding*, 10 Bank. Dev. J. 171, 183–84 (1993) (pointing out the contradictory language of § 1410(a)); *In re Officina Conti, S.R.L.*, 118 B.R. 392, 394 (Bankr.D.S.C.1989) (rejecting a "nonsensical construction" of § 1410(a) that "would require the action to be pending before the debtor could seek an injunction to prevent its commencement").

Second, the Bankruptcy Court resolved the ambiguity in the statute by construing it in a logical, common sense manner. The Bankruptcy Court correctly rejected General Mills's argument that subsection (a) must be read as requiring a party to seek an injunction in the district in which it anticipates the "action or proceeding" will be pending, *i.e.*, where it will be filed. This interpretation would require re-writing the statute to replace the words "is pending" with the words "will be pending." Moreover, it will not always be clear where a creditor might commence an action and thus a would-be § 304 petitioner would be left guessing where an action or proceeding might be brought. In addition, where a party faces multiple potential lawsuits by creditors in different jurisdictions, that party would have to file multiple petitions and "chase those creditors around the country." 238 B.R. at 45. As the Bankruptcy Court concluded, such a result would "inhibit judicial economy, administrative efficiency, decisional consistency, and perhaps most important, comity." *Id.*; *see Collier on Bankruptcy* ¶ 4.03[2] (15th

ed. 2001) ("It would be absurd to force a foreign representative to file numerous section 304 petitions throughout the country, which would be a waste of judicial resources and could lead to inconsistent judgments."); *see also In re Saleh*, 175 B.R. 422, 425 (Bankr.S.D.Fla.1994).

General Mills argues that Gold Medal was the only creditor to threaten suit and thus Hopewell was not faced with the possibility of multiple actions or proceedings. The Bankruptcy Court rejected this argument as a factual matter, accepting the testimony of Hopewell's representative that other Hopewell creditors "[we]re waiting in the wings" to see what happened with Gold Medal. 238 B.R. at 45. The Bankruptcy Court's factual determination is not clearly erroneous.

Accordingly, the Bankruptcy Court's determination that venue lies in this District under § 1410(c) is affirmed.

## C. *The Merits*

Section 304 of the Bankruptcy Code provides a mechanism by which bankruptcy courts in the United States can provide assistance—a "helping hand"—to foreign courts that are handling international insolvencies. *See* 238 B.R. at 54 (citing cases). It permits a party to bring an ancillary proceeding—not a "full-scale bankruptcy case"—in bankruptcy court to enjoin suits or actions in the United States against a debtor in insolvency proceedings in another country, to avoid piecemeal litigation and to encourage "deference to the country where the primary insolvency proceeding is located . . . and flexible cooperation in administration of assets." *In re Simon*, 153 F.3d 991, 998 (9th Cir.1998), *cert. denied*, 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999); *see also Treco*, 240 F.3d at 153–54; *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 348 (2d Cir.) (holding that bankruptcy court has broad

latitude under § 304 to fashion appropriate remedy in ancillary proceedings and that "purpose of a § 304 petition is to prevent the piecemeal distribution of assets in the United States by means of legal proceedings initiated in domestic courts by local creditors") (citations omitted), *cert. denied,* 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992); *In re Caldas,* 274 B.R. 583 (Bankr.S.D.N.Y.2002).

Section 304 provides in pertinent part as follows:

(a) A case ancillary to a foreign proceeding is commenced by the filing with the bankruptcy court of a petition under this section by a foreign representative.

(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may—

(1) enjoin the commencement or continuation of—

(A) any action against—(i) a debtor with respect to property involved in such foreign proceeding; or (ii) such property; or . . .

(3) order other appropriate relief.

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with—

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of such claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title; [and]

(5) comity . . . .

11 U.S.C. § 304.[3]

Three issues are presented: First, was the process by which the Scheme was adopted and approved in Bermuda a "foreign proceeding" within the meaning of § 304? Second, is the Board a "foreign representative" within the meaning of the statute? Third, did the Bankruptcy Court abuse its discretion in granting the petition here?

### 1. *Foreign Proceeding*

■ The Bankruptcy Code defines a "foreign proceeding" as:

[a] proceeding, whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization.

11 U.S.C. § 101(23). Hence, a "foreign proceeding" must be conducted in a foreign country under judicial or administrative supervision for the specified purposes. *See* Collier ¶ 304.02[1]; *In re Tam,* 170 B.R. 838, 842–43 (Bankr.S.D.N.Y.1994). Here, the Bankruptcy Court held that the process by which the Scheme was adopted and approved was a "foreign proceeding" covered by § 304. I agree.

The proceeding was a judicial proceeding in Bermuda to adjust Hopewell's assets and debts. Although the proceeding was a "stand-alone" scheme of arrange-

---

**3.** A sixth factor applies only to cases involving individuals and thus is not relevant here. 11 U.S.C. § 304(c)(6).

ment not implemented "in tandem with another statutory vehicle for debt manipulation such as a voluntary liquidation, administration or court-ordered winding up," 238 B.R. at 48, it was nonetheless subject to court supervision. Hopewell had to petition the Bermuda Supreme Court for leave to convene the required creditors' meeting. A hearing was held, after which the Bermuda court signed an order approving the notices, proxy forms, process for valuating claims, and procedures for voting, all of which had been submitted to the court for review.

Hopewell had to file a second petition with the Bermuda court for approval of the Scheme. Creditors had the right to object to the proposed scheme of arrangement. A second hearing was held, after which the Bermuda court issued an order approving the Scheme. Even thereafter, continued court involvement was required, as the Bermuda court issued the Bermuda injunction in 1998. Recently, during the pendency of this appeal, the parties were before the Bermuda court again. As the Bankruptcy Court noted, the Bermuda court remained available, even after the Scheme was approved, "to resolve classification disputes, enforce the provisions of the scheme and review actions by the scheme administrators." 238 B.R. at 49. *See In re Ward*, 201 B.R. 357, 361 (Bankr. S.D.N.Y.1996).

The Bankruptcy Court's determination that the Bermuda proceeding was a "foreign proceeding" within the meaning of § 304 is affirmed.

### 2. *Foreign Representative*

■ The second threshold issue is whether the Board is a "foreign representative" qualified to file a petition pursuant to § 304.

The Bankruptcy Code defines a "foreign representative" as a "duly selected trustee, administrator, or other representative of

an estate in a foreign proceeding." 11 U.S.C. § 101(24). Plainly, the Board fits within this definition.

Although General Mills and Gold Medal argue that the Board was not appointed by a court to act as a "foreign representative," nothing in the statute requires a court appointment. Courts have recognized creditor-elected or creditor-appointed liquidators in foreign voluntary liquidations to be foreign representatives. *See, e.g., In re Ward*, 201 B.R. at 360. Moreover, no logical reason exists to prohibit a board of directors of a solvent debtor company from acting as a foreign representative for purposes of bringing an ancillary proceeding pursuant to § 304. Accordingly, the Bankruptcy Court is affirmed in this respect. *See* 238 B.R. at 53–54; *see also Matter of Kingscroft Ins. Co.*, 138 B.R. 121, 124 (Bankr.S.D.Fla.1992) (boards of directors of insolvent British and Bermuda insurance companies held to qualify as "foreign representatives" under § 304).

### 3. *The Bankruptcy Court's Decision To Grant the Petition*

■ Applying the five relevant factors set forth in § 304(c), the Bankruptcy Court granted Hopewell's petition. It concluded initially that because Hopewell was solvent and there were sufficient funds to pay all creditors in full, "the goals of maximizing the estate for the benefit of all creditors and dividing up that estate so as to achieve equality among class members [were] much less strongly implicated." 238 B.R. at 55. Hence, the Bankruptcy Court concluded that "neither the omission of avoidance powers nor any deviation from the usual distributive provisions applicable in windings-up is cause for any concern." *Id.* at 56.

The Bankruptcy Court also determined that creditors—including Gold Medal— were not unjustly treated under the

Scheme. The Bankruptcy Court was not receptive to Gold Medal's assertion that it was unfairly treated because Gold Medal had failed to take advantage of numerous opportunities to object in the Bermuda proceedings. As Judge Brozman noted, Gold Medal "accepted its class A claim for voting purposes; it voted in favor of the scheme; it did not object at the sanction hearing; it did not appeal the Sanction Order; and it did not seek to have the Bermuda Injunction altered or rescinded." *Id.* at 60. Although Gold Medal argues that it did not vote in favor of the Scheme, the Bankruptcy Court held otherwise and this factual determination, which is supported by evidence in the record, *see* 238 B.R. at 40–41, is entitled to deference on appeal.

The Bankruptcy Court considered but rejected Gold Medal's contention that it would be prejudiced or inconvenienced if it were required to arbitrate in Bermuda in accordance with Bermuda law instead of in Minnesota under Minnesota law. Although the Reinsurance Agreement provided for arbitration in Minnesota, the Bankruptcy Court again noted that Gold Medal had voted in favor of the Scheme. Moreover, the Bankruptcy Court observed that "Bermuda is a sister common law jurisdiction" and the arbitration would be conducted under rules and procedures consistent with a model law adopted by many states in the United States and often used to supplement federal arbitrations as well. 238 B.R. at 63. The Bankruptcy Court also noted that "[b]ankruptcy sometimes causes changes in contractual rights necessary to benefit the estate as a whole." *Id.* at 63; *see also In re U.S. Lines Inc.*, 197 F.3d 631, 639–40 (2d Cir.1999) (notwith-

standing strong federal policy in favor of arbitration, bankruptcy court may stay arbitration in core proceedings in certain circumstances); *Cunard v. Salen Reefer Serv. AB*, 773 F.2d 452, 459 (2d Cir.1985) ("There is ... no compelling policy reason for a general creditor whose claim is subject to arbitration to receive a preference over other creditors.").

Finally, the Bankruptcy Court considered the question of comity and concluded that the Bermuda Injunction was entitled to comity. It noted that Congress had "explicitly recognized comity as an important principle in transnational insolvency situations when it revised the bankruptcy laws." *Id.* at 67 (citing *Maxwell Comm. Corp. v. Societe Generale*, 93 F.3d 1036, 1048 (2d Cir.1996)). Judge Brozman also noted that the Scheme sought "to concentrate the claims resolution process in one forum and under one law" to "streamline and economically perform that activity and to enhance uniformity of result." 238 B.R. at 66. The Bankruptcy Court held that if Gold Medal, as one creditor, were allowed to deviate from the established procedures, the "efficacy" of the Scheme and Hopewell's "efforts to collect assets and administer them for the collective good of all creditors" would be undermined. *Id.*[4]

I conclude that the Bankruptcy Court did not abuse its discretion in granting Hopewell's petition. Applying the statutory factors, and balancing the reasons for and against affording comity, *see Treco*, 240 F.3d at 158, I hold that the Bermuda Injunction should be granted comity. The Scheme is the result of a foreign judicial proceeding intended to adjust all claims against Hopewell in one forum. The Ber-

---

4. As the Second Circuit has made clear, however, although "comity is the ultimate consideration in determining whether to provide relief under § 304," "comity does not ... automatically override the other specified fac-

tors." *Treco*, 240 F.3d at 156; *see also id.* at 157 ("The principle of comity has never meant categorical deference to foreign proceedings.").

muda injunction and the Bermuda court's order approving the Scheme were issued only after all creditors—including Gold Medal—were given notice, had an opportunity to be heard, and voted in favor of the Scheme. Although, as Gold Medal and General Mills argue, there is a strong federal policy in favor of arbitration, under the Scheme Gold Medal does not lose its right to arbitrate—it simply has to do so in Bermuda, along with all other creditors with disputed or unliquidated claims. There is no reason to doubt that the arbitration proceedings in Bermuda will be "fair, impartial, procedurally sound, and free from fraud." *Treco,* 240 F.3d at 158.

Under all the circumstances, and as a matter of judicial efficiency and fairness to all parties, individual creditors ought not to be able to bring individual actions or proceedings against Hopewell in courts throughout the United States. According comity to the Bermuda injunction would be consistent with, and certainly would not violate, United States public policy. *See Victrix Steamship Co. v. Salen Dry Cargo,* 825 F.2d 709 (2d Cir.1987) (upholding extension of comity to foreign insolvency proceedings even though such an extension would not allow creditors to enforce arbitration awards in the United States); *Vesta,* 244 B.R. at 216–17 (affirming bankruptcy court's decision to grant § 304 petition and holding that "[i]n this conflict between the Bankruptcy Code and the statutory scheme governing arbitration, it is the Bankruptcy Code that prevails").

### CONCLUSION

For the reasons set forth above, the order of the Bankruptcy Court is affirmed, in all respects.

SO ORDERED.