13 F.3d 33
 63 Fair Empl.Prac.Cas. (BNA) 964,
63 Empl. Prac. Dec. P 42,824, 62 USLW 2393
 John R. PATTERSON; Roland J. Broussard; Elmer Stevenson,
on their own behalf and on behalf of all other persons
similarly situated, and Equal Employment Opportunity
Commission, Plaintiffs-Appellants,
v.
NEWSPAPER & MAIL DELIVERERS' UNION OF NEW YORK & VICINITY,
et al., Defendants-Appellees.
 Nos. 1476, 1480, Dockets 92-7964, 92-6242.
 United States Court of Appeals,
Second Circuit.
 Argued June 21, 1993.
Decided Dec. 20, 1993.
 
 Jennifer S. Goldstein, E.E.O.C., Washington, DC (Donald R. Livingston, Gen. Counsel, Gwendolyn Young Reams, Assoc. Gen. Counsel, and Vincent J. Blackwood, Asst. Gen. Counsel, E.E.O.C., on the brief), for plaintiff-appellant, E.E.O.C.
 Charles Stephen Ralston, New York City (Elaine R. Jones, Marina C. Hsieh, N.A.A.C.P. Legal Defense & Educational Fund, Inc., New York City, and Penda D. Hair, N.A.A.C.P. Legal Defense & Educational Fund, Inc., Washington, DC, on the brief), for plaintiffs-appellants Patterson, Broussard, and Stevenson.
 Jedd Mendelson, New York City (Grotta, Glassman & Hoffman, on the brief), for defendant-appellee New York Times Co.
 Kathleen M. McKenna, New York City (Julia Henick, Proskauer Rose Goetz & Mendelsohn, on the brief), for defendant-appellee Daily News, L.P.
 Before: NEWMAN, Chief Judge, VAN GRAAFEILAND and ALTIMARI, Circuit Judges.
 JON O. NEWMAN, Chief Judge:
 
 
 1
 This appeal primarily concerns the appropriate standard for modification of a consent decree in litigation not involving a governmental entity as a party. The Equal Employment Opportunity Commission ("EEOC") and a class of minority employees appeal from the July 30, 1992, order of the District Court for the Southern District of New York (William C. Conner, Judge), vacating in its entirety a consent decree originally approved in 1974. Patterson v. Newspaper & Mail Deliverers' Union, 797 F.Supp. 1174 (S.D.N.Y.1992). The decree created a comprehensive affirmative action program for New York City area newspaper deliverers. In addition, the decree contains broad prohibitions against discrimination and provides for an Administrator to enforce the anti-discrimination and affirmative action provisions. On appeal, EEOC and the minority employee class, represented by the NAACP Legal Defense and Education Fund, Inc. ("LDF"), contend that the District Court applied the wrong standard in deciding whether to modify any aspect of the decree. LDF argues that none of the decree should have been vacated; the EEOC argues that the District Court erred in vacating the anti-discrimination provisions, but takes no position with respect to the affirmative action program and the Administrator.
 
 
 2
 We conclude that the District Court applied the correct standard and was entitled to vacate the entire consent decree since its essential purpose had been achieved. We therefore affirm.Background
 
 
 3
 Through closed and union shop agreements, defendant Newspaper & Mail Deliverers' Union ("the Union") controls access to newspaper and publication delivery jobs in the New York City region. From 1901 to 1952, the Union limited membership to the legitimate first-born sons of other Union members. In 1952, the Union abandoned its primogeniture system, and, with the cooperation of the New York City area newspapers and publishers, adopted a new series of membership and work rules. This system divided workers into those holding permanent jobs, who are said to have "regular situations," and those employed irregularly, who are called "shapers." The shapers were further divided into groups with descending daily hiring priority. Each employer maintained a "Group I" list, which was restricted to persons who had once held regular situations in the industry. After offering daily work to each person on the Group I list, the employer next looked to an industry-wide Group II list, which consisted of all persons in the industry on Group I lists or holding regular situations. Thus, Group II provided an opportunity for deliverers to supplement their income at an employer other than their usual employer. If additional daily work was available, the major employers would look to a Group III list, which consisted of persons who appeared for daily work a minimum number of times per week, even if no work was available. Union membership was limited to persons holding regular situations, and minorities were discouraged from joining the Group III lists. Moreover, although by contract the group lists provided the basis for filling vacant regular situations, various abuses made it nearly impossible for anyone to move from Group III to a regular situation. The Union allowed employees at one employer to shift to the Group I list of another employer and occasionally provided Group I status to relatives and associates of Union members.
 
 
 4
 In 1973, EEOC and a group of minority deliverers, who sued for themselves and others similarly situated, brought separate actions against the Union and the employers under Title VII of the 1964 Civil Rights Act. They contended that the 1952 system, although facially neutral, perpetuated discrimination against minorities. The cases were consolidated and brought to trial before then-District Judge Pierce. After all the evidence was presented, but before the District Court ruled, the parties entered into a settlement agreement, which Judge Pierce approved and incorporated into a final judgment. Patterson v. Newspaper & Mail Deliverers' Union, 384 F.Supp. 585 (S.D.N.Y.1974). The judgment directs the Union and employers to implement and perform the agreement, and retains jurisdiction in the District Court for enforcement and any subsequent applications. In a written opinion, Judge Pierce made detailed factual findings of a long-established pattern of discrimination against minorities. Statistically, minorities accounted for 30 percent of the eligible workforce, and only two percent of deliverers (with an even smaller percentage among regular situation holders and Group I members). We affirmed Judge Pierce's decision over the objection of White Group III deliverers who complained that the agreement unfairly favored minorities. Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767 (2d Cir.1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976).
 
 
 5
 The settlement agreement contains five sections. The introductory section consists of a series of "whereas" clauses, stating that there has been no admission of a violation of law but acknowledging the existence of a "statistical imbalance" in minority representation. The final clause of this section states that the agreement "is designed to correct the aforesaid statistical imbalance, to remedy and eradicate its effects, and to put minority individuals in the positions they would have occupied had the aforesaid statistical imbalance not existed." Section A of the agreement consists of broad prohibitions against any action with a discriminatory effect by either the Union (p 1) or employers (p 2). Section B of the agreement creates the office of the Administrator. The Administrator is authorized to resolve all complaints involving disparate treatment, subject to review by the District Court (p 4). His term is fixed as "an initial period of five (5) years"; subsequently he or his successor "shall remain in office if and for such time as the Court may direct" (p 6).
 
 
 6
 Section C of the agreement is a detailed affirmative action program. The purpose of the program is to achieve "a minimum goal of 25% minority employment in the industry ... by June 1, 1979" (p 7), although the following paragraph states that this level "is not an inflexible quota but an objective" (p 8). To achieve this goal, the agreement provides that all minorities currently in Group III are to be moved up immediately to Group I (p 9); that regular situation positions are to be filled exclusively from Group I by seniority (p 10); that for each regular situation filled, one Group III deliverer will move up to Group I, alternating between the most senior minority and most senior nonminority (p 11); and that Group III vacancies are to be filled with three minorities for every two nonminorities (p 15). Various other provisions establish slight variations for certain employers (pp 12-13), impose some special one-time rules (p 14), limit transfers (pp 18-19), and require the Union to offer membership to anyone in Group I (p 20).
 
 
 7
 Finally, section D of the agreement, entitled "general provisions," requires employers to help qualified individuals apply for employment (p 28), regulates employment applications (p 29), requires compliance reports (pp 30-31), provides for backpay to certain members of the class (pp 37, 39), and provides for continued jurisdiction in the District Court (p 41). The only provision in section D that arguably contemplates the termination of the agreement is paragraph 33, which states that inconsistent provisions in collective bargaining agreements are suspended, but "may be put into effect when the order terminates, unless the Court orders otherwise."
 
 
 8
 By 1979, minority employment was only 13.3 percent, and Judge Pierce ordered the office of the Administrator extended for another five years. Patterson v. Newspaper & Mail Deliverers' Union, 23 Empl.Prac.Dec. (CCH) p 31,001 (S.D.N.Y.1980). In 1984, the office was extended on an indefinite basis. In 1985, the defendants moved to terminate the order embodying the settlement agreement on the ground that the 25 percent goal had been reached. In 1987, Judge Conner, to whom the case has been reassigned, found that while some employers had reached 25 percent minority employment, the goal of the settlement agreement was industry-wide minority representation of 25 percent. Judge Conner deferred further consideration of the motion until there was sufficient evidence that this goal had been attained. In November 1988, Judge Conner concluded that there was sufficient evidence to suspend operation of the two ratios in the affirmative action program (i.e., the 50 percent quota for filling Group I vacancies and the 60 percent quota for filling Group III vacancies) pending resolution of the motion.
 
 
 9
 In May 1991, the Interim Administrator submitted a report finding an industry-wide figure of 28.53 percent and substantial compliance by most employers. After the plaintiffs declined to challenge this figure, the District Court scheduled a hearing on vacating the entire order. The private plaintiffs opposed vacation of any part of the decree. EEOC did not oppose termination of the affirmative action program, but argued that paragraphs 1, 2, 20, 28, 29, 33, and 41 of the settlement agreement should be retained.
 
 
 10
 In a comprehensive opinion dated July 8, 1992, Judge Conner concluded that the order should be vacated in its entirety. He ruled that modern cases have established a flexible standard for vacating consent decrees, and that this standard allowed termination of a decree once its primary purpose had been attained. He rejected the private plaintiffs' argument that the decree had to remain in force until every facet of discrimination was eliminated, and rejected the EEOC's argument as a "cut and paste approach." Plaintiffs filed a motion to amend the judgment under Fed.R.Civ.P. 59(e), which was denied. However, the District Court modified its earlier order so as to allow discrimination claims filed with the Administrator prior to July 8, 1992, to be processed.
 
 Discussion
 
 11
 1. Legal standard for modification of a consent decree
 
 
 12
 EEOC primarily contends that the District Court erred in applying a flexible standard for modification of the consent decree instead of applying a more rigorous standard. The rigorous standard urged by EEOC dates from United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), in which the Supreme Court held that an antitrust consent decree could not be modified unless the defendant showed that the dangers leading to implementation of the decree had become "attenuated to a shadow," id. 286 U.S. at 119, 52 S.Ct. at 464. The Court also held that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." Id.
 
 
 13
 The adoption of a more flexible standard was intimated in United States v. United Shoe Machinery Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), in which the Supreme Court cautioned that the "grievous wrong" standard should not be read out of context, and allowed the United States to obtain modification of an antitrust injunction in order to strengthen restrictions on the defendant. The seminal case actually applying a more flexible standard is New York State Association for Retarded Children, Inc. v. Carey, 706 F.2d 956 (2d Cir.), cert. denied, 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). Judge Friendly's opinion read Swift 's "grievous wrong" language as limited to the special facts of that case, and found that the appropriate standard, at least in an institutional reform case, was one of flexibility, leaving to the District Court a "rather free hand," id. at 970. Two recent Supreme Court cases have held that district courts erred in applying Swift, rather than a more flexible standard, to the modification of consent decrees or injunctions in institutional reform cases. In Board of Education of Oklahoma City Public Schools v. Dowell, 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991), the Court held that a finding that a school district was operating constitutionally and unlikely to return to its past ways mandated the termination of a desegregation order. In Rufo v. Inmates of Suffolk County Jail, --- U.S. ----, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Court held that any showing of a significant change in factual conditions or law would justify a modification of a decree enjoining double bunking and requiring officials to build a new prison; the Court remanded for consideration of whether an upsurge in prison population had been unforeseen.
 
 
 14
 In the pending case, the District Court rejected EEOC's contention "that this case is governed solely by ... Swift," 797 F.Supp. at 1179, and looked to the flexible standard of Dowell and Rufo. In an important footnote, Judge Conner noted that though the flexible standard had previously "only been invoked in cases where the conduct of a governmental facility or operation was being regulated," the present case sufficiently implicated "the public's right in seeing that persons are not deprived of fundamental rights" to come within the "institutional reform exception." Id. at 1180 n. 8.
 
 
 15
 EEOC is probably correct that the District Court's decision is the first to explicitly adopt the flexible standard of Dowell and Rufo, rather than the rigorous standard of Swift, in a case not involving a governmental entity. It is also true that the recent Supreme Court cases have each, to an extent, invoked federalism and democratic rule concerns as a justification for their use of a flexible standard in the context of institutional reform litigation, see Rufo, --- U.S. at ---- - ----, 112 S.Ct. at 758-59; Dowell, 498 U.S. at 247-49, 111 S.Ct. at 637. But New York State Association makes a more general argument for the flexible standard, based on the difficulties in implementing any complex decree in the institutional setting, see 706 F.2d at 969-70, and the discussions of Swift in each of the leading cases, as well as in United Shoe, suggest that Swift is a special case that should not be read as setting down a general standard for all future cases. See Rufo, --- U.S. at ----, 112 S.Ct. at 758 ("Our decisions since Swift reinforce the conclusion that the 'grievous wrong' language of Swift was not intended to take on a talismanic quality, warding off virtually all efforts to modify consent decrees."); Dowell, 498 U.S. at 246, 111 S.Ct. at 636; United Shoe, 391 U.S. at 248; New York State Association, 706 F.2d at 968-69. Moreover, we have suggested in a post-Rufo decision, Still's Pharmacy, Inc. v. Cuomo, 981 F.2d 632 (2d Cir.1992), that Rufo constitutes a wholesale change, not limited to institutional reform cases. See id. at 636-37 (citing District Court decision in this case for approval).
 
 
 16
 Among other circuits, there appears to be some dispute as to the appropriate standard for modifying consent judgments. The Seventh Circuit has flatly declared that Rufo gave the "coup de grace " to Swift, noting that although Rufo "involved institutional reform litigation, the 'flexible standard' ... is no less suitable to other types of equitable case." In re Hendrix, 986 F.2d 195, 198 (7th Cir.1993). Three circuits have said that Swift 's strict standard has been relaxed in institutional reform litigation, Lorain NAACP v. Lorain Bd. of Education, 979 F.2d 1141, 1149 (6th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993); W.L. Gore & Associates, Inc. v. C.R. Bard, Inc., 977 F.2d 558, 562 (Fed.Cir.1992); Epp v. Kerrey, 964 F.2d 754, 756 (8th Cir.1992), but two of these courts have not considered the appropriate standard in public issues litigation not involving a governmental entity, see Lorain NAACP, 979 F.2d at 1149; Epp, 964 F.2d at 756, and one merely declined to apply the flexible standard to traditional commercial litigation, W.L. Gore, 977 F.2d at 562.
 
 
 17
 We agree with Judge Conner that the flexible standard outlined in Dowell and Rufo is not limited to cases in which institutional reform is achieved in litigation brought directly against a governmental entity. The "institution" sought to be reformed need not be an instrumentality of government. If a decree seeks pervasive change in long-established practices affecting a large number of people, and the changes are sought to vindicate significant rights of a public nature, it is appropriate to apply a flexible standard in determining when modification or termination should be ordered in light of either changed circumstances or substantial attainment of the decree's objective. Decrees in this context typically have effects beyond the parties to the lawsuit, as is true of the provisions for affirmative action remedies in this case. Though it is important to make sure that agreements in such litigation are not lightly modified, it is also important to provide all concerned with an incentive to enter into constructive settlements so that protracted litigation can be avoided and useful remedies developed by agreement, rather than by judicial command. There is an inevitable tension between the objectives of promoting adherence to agreements and of fostering a climate in which constructive settlements may be readily reached. For plaintiffs, the certainty that an agreement will be enforced without modification is an incentive to negotiate a settlement that achieves some, though not all, of what might have been obtained in litigation. For defendants, however, it is the prospect of modification as circumstances change or objectives are substantially reached that provides the incentive to settle on reasonable terms, rather than adamantly resist in protracted litigation. The tension between these competing objectives cannot be eliminated, but it can and should be sensitively adjusted by courts of equity, exercising their historic powers both to provide remedial relief and, when appropriate, to terminate their authority. We therefore agree with Judge Conner that it was appropriate to apply a flexible standard in determining whether to dissolve the decree.
 
 2. Application of the standard
 
 18
 In considering the District Court's decision to vacate the entire decree, it will be convenient to focus initially on the affirmative action provisions of the decree. Only LDF contends that these provisions should be retained. LDF does not dispute that minority representation has reached 25 percent, nor even the District Court's finding that minority representation is likely to increase since many White employees with regular situations are near retirement age and the Group I and Group III lists contain greater than 25 percent minority representation. LDF also does not dispute that it would have been proper to suspend the fixed quotas had the defendants achieved the 25 percent goal by 1979. But LDF contends that the defendants' failure to meet that goal by 1979 requires (a) setting a new goal now, commensurate with the percentage of minorities in the qualified workforce, and (b) retaining the hiring quotas until the new goal is met. LDF states that the 1980 census showed that minorities constituted 42 percent of the workforce, and that the 1990 census shows a figure of more than 50 percent.
 
 
 19
 LDF relies on Youngblood v. Dalzell, 925 F.2d 954 (6th Cir.1991), in which the Sixth Circuit reversed the termination of a consent decree and remanded to the District Court for further consideration of whether a higher affirmative action goal should be set after the defendant failed to meet the goal within the deadline set in the decree. The decree in that case stated that it was intended to achieve a "workforce composition which will not support any inference of racial discrimination in hiring," id. at 961. The consent decree in this case could perhaps be read to support a similar goal. The decree states that it is intended to remedy a "statistical imbalance," and it is clear that the 25 percent figure was chosen with reference to the 1970 census figure of a 30 percent minority workforce. Nevertheless, the decree does not suggest that its purpose is to achieve total parity, and the 25 percent figure, as a numerical goal, is stated in absolute terms, without any suggestion that it is subject to modification. Indeed, the decree suggests that if any factor is flexible, it is the time limit. Paragraph 6 allows extension of the office of Administrator beyond five years, and paragraph 8 states that the 25 percent goal "is not an inflexible quota but an objective to be achieved by the mobilization of available personnel and resources of the defendants hereto in a good faith effort to maximize employment opportunities for minorities." Both the difficulty of achieving the 25 percent goal and the likelihood that the percentage of minorities in the blue collar workforce would increase were foreseeable in 1974. Whether or not the District Court might have had discretion to raise the 25 percent figure as a remedy for not meeting it as originally contemplated, the Court was surely entitled to conclude that such an increase was not required. Finally, with no increase in the percentage goal, it was proper to dissolve the 50 percent quota for promotions from Group III to Group I and the 60 percent quota for listings in Group III.
 
 
 20
 Once the District Court decided that achievement of the 25 percent goal justified elimination of the affirmative action provisions, without any increase in the percentage, it then had to decide whether to vacate the entire decree. Though other portions of the decree provide the plaintiff class with enforcement mechanisms for redressing any ongoing discrimination that may be more expeditious than the initiation of new litigation, we agree with Judge Conner that the decree has served its purpose, and that all of its provisions may be ended. Again, we do not decide that the District Court was required to vacate these additional provisions, only that it was entitled to do so. Application of the flexible standard for modifying decrees in the context of this lawsuit seeking broad remedies to change hiring practices entitles a court of equity to focus on the dominant objective of the decree and to terminate the entire decree once that objective has been reached.
 
 
 21
 Affirmed.