**In re PETITION OF THE BOARD OF DIRECTORS OF HOPEWELL INTERNATIONAL INSURANCE, LTD., as Scheme Administrators of Hopewell International Insurance, Ltd., Debtor in a Foreign Proceeding.**

**No. 98–B–45440 (ALG).**

United States Bankruptcy Court,
S.D. New York.

June 27, 2002.

---

Chadbourne & Parke, LLP, New York City, Howard Seife, Marjorie L. Cohen, Andrew Rosenblatt, Of Counsel, Counsel for the Board of Directors of Hopewell International Insurance Ltd.

Allen & Overy, New York City, Ken Coleman, Steve Doody, Ingrid Bagby, Of Counsel, Counsel for Gold Medal Insurance Company.

Seward & Kissel, LLP, New York City, Ronald L. Cohen, Of Counsel, Zelle, Hofmann, Voelbel, Mason & Gette, LLP, Minneapolis, MN, Lawrence Zelle, Lawrence T. Hofmann, Of Counsel, Co-counsel for General Mills, Inc.

## MEMORANDUM OF DECISION

ALLAN L. GROPPER, Bankruptcy Judge.

This is a motion by Gold Medal Insurance Company ("Gold Medal") for a modification of the permanent injunction (the "Permanent Injunction") issued by this Court in August of 1999 granting the petition by Hopewell International Insurance Ltd. ("Hopewell") for ancillary relief under § 304 of the United States Bankruptcy Code. The Permanent Injunction, which has since been affirmed by the District Court, prohibited the commencement or continuation of any action or proceeding against Hopewell or its United States assets in violation of Hopewell's Bermuda Scheme of Arrangement. For the reasons set forth below, this Court finds that there is insufficient cause to warrant the requested modification of the Permanent Injunction.

### I Background

The history of these parties and the proceedings before this Court and the Bermuda Court is more fully set forth in the previous reported decisions in this case: (i) *In re Board of Directors of Hopewell International Insurance Ltd.*, 238 B.R. 25, 64 (Bankr.S.D.N.Y.1999) (*"Hopewell I"*), the comprehensive opinion of Chief Judge Brozman, issued after eight days of hearings, and now affirmed in all respects by the District Judge Chin at 275 B.R. 699,

701 (S.D.N.Y.2002) ("*Hopewell II* "); and (ii) an opinion of this Court, *In re Board of Directors of Hopewell International Insurance Ltd.*, 272 B.R. 396 (Bankr. S.D.N.Y.2002) ("*Hopewell III* "), that dealt with an injunction that Hopewell obtained from the Bermuda Court prohibiting Gold Medal from bringing this very motion seeking a modification of the Permanent Injunction.

To recapitulate the facts, briefly, Gold Medal is a "captive" insurer of its affiliate, General Mills, which claimed to have suffered substantial insured losses arising from a 1994 incident in which cereal oats were tainted with a pesticide. Gold Medal reinsured its losses with Hopewell, and Hopewell, in turn, ceded most of the liability to other reinsurers, called "retrocessionaires," who are Hopewell's shareholders and apparently control its Board.

Hopewell suffered substantial reverses in the late 1980's and in 1995 adopted a Scheme of Arrangement to wind up its operations. Under Bermuda law, a Scheme of Arrangement is a contractual adjustment of rights between a company and its shareholders and creditors (collectively, "stakeholders"). In this case, the Scheme of Arrangement was a run-off, in which Hopewell would pay its stakeholders from amounts on hand and from recoveries from the retrocessionaires. Bermuda law requires that a Scheme be approved by a meeting of creditors representing more than 75% of the value of actual and contingent claims. Gold Medal's claim was unliquidated at the time of the meeting, but it did not object to the Scheme and Judge Brozman found that it had in fact voted to approve the Scheme (a finding that Gold Medal disputes but that the District Court specifically affirmed). In any event, the Scheme was adopted and on June 30, 1995, Hopewell began its run-off.

The Scheme provided for a distribution of Hopewell's assets in two waves: first, to Class A creditors, whose claims were established (liquidated or unliquidated) by June 1, 1995, in a distribution to be paid to holders of liquidated claims no later than June 30, 1999; and second, to Class B creditors, whose claims were not established as of June 1, 1995, in a distribution to be paid on June 30, 2001. If Hopewell became insolvent before the distribution of Class A creditors, then all creditors of both classes would be paid *pari passu*. If Hopewell's insolvency occurred after the payment of Class A creditors, but prior to the payment to Class B creditors, Class B creditors would receive less than the 100% distribution made to Class A creditors. Gold Medal was a Class A creditor. The Scheme also provided that if a claim was not liquidated by June 30, 2001, the creditor would lose any right of recovery against Hopewell, but would receive an assignment of Hopewell's rights against the retrocessionaires. Thus, the projected "cut-off" date for the establishment of claims and a final distribution of Hopewell's cash was June 30, 2001. Hopewell's principal assets in the United States were its contractual rights to recover against the retrocessionaires.

In order to liquidate its claim, General Mills commenced proceedings in Minnesota against Gold Medal that eventually resulted in a settlement on liability and a "baseball" style arbitration to determine an appropriate amount. This arbitration was scheduled to take place in August 1998. Hopewell, however, informed Gold Medal that it would not honor a settlement between General Mills and Gold Medal and would reject any claim by Gold Medal on the basis thereof. Hopewell contended that its Scheme required that all disputed claims with Hopewell be resolved by arbitration in Bermuda to be commenced prior to January 31, 2000. After Gold Medal

apparently threatened suit against Hopewell's U.S.-based retrocessionaires, based on the results in Minnesota, Hopewell sought and obtained an order from the Bermuda Court enjoining Gold Medal from commencing any action inconsistent with the Scheme of Arrangement (the "Bermuda Injunction"). In July of 1998, Hopewell then sought to enforce the Scheme and the Bermuda Injunction in this country by commencing an ancillary proceeding under 11 U.S.C. § 304, contending that the Scheme of Arrangement was a "foreign proceeding," that its Board of Directors was a "foreign representative," and that this Court should recognize and grant comity to the Bermuda Scheme and Injunction. As noted, Chief Judge Brozman of this Court held that the Bermuda Injunction and the Bermuda Scheme of Arrangement were entitled to comity and that Gold Medal would not be unfairly prejudiced by entry of the Permanent Injunction, prohibiting it from pursuing its claims against Hopewell in the United States other than through the Scheme, and requiring that it arbitrate any dispute with Hopewell under Bermuda law, despite the fact that the contract between Gold Medal and Hopewell provided for arbitration in Minnesota. *Hopewell I*, 238 B.R. at 64. The Bankruptcy Court's decision was subsequently affirmed by the District Court. *Hopewell II*, 275 B.R. at 701.

While the § 304 proceedings were awaiting decision in this Court, General Mills filed a motion to rescind the settlement in Minnesota with Gold Medal, which was granted in June 1999, two months prior to the entry of the 1999 Injunction. After the settlement was rescinded, the Minnesota court referred the pending case to a retired judge, who reviewed cross motions for summary judgment and recommended that judgment be entered in favor of General Mills and against Gold Medal in the sum of approximately $203 million. The

Minnesota District Court adopted the report and entered final judgment against Gold Medal on June 23, 2000, a judgment that was affirmed by an opinion of the Minnesota Court of Appeals on February 6, 2001, reported at *General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147 (Minn.App.2001), with review denied by the Minnesota Supreme Court. These proceedings, however, were not recognized by Hopewell as conclusive and in late January, 2000, bound by the 1999 Injunction, Gold Medal commenced arbitration proceedings in Bermuda. Arbitration between Gold Medal and Hopewell regarding procedural matters began in June 2000, and the panel issued an Interim Award in December 2000, concluding that Hopewell was not bound by the judgment of the Minnesota courts. Hearings on substantive matters began in May of 2001.

It became obvious in early 2001 that the panel would not issue a final award prior to Hopewell's final meeting of creditors and the Scheme's June 30, 2001 cut-off date. Gold Medal, therefore, requested a postponement of the meeting. Hopewell objected, and on March 22, 2001, the Bermuda Court determined that Hopewell would be permitted, in accordance with the express terms of the Scheme, to hold its final meeting and make a final distribution to creditors no later than June 30, 2001, whether or not the Gold Medal/General Mills claim had been liquidated by then. Any remaining cash would then be distributed in a final dividend to Hopewell's shareholders. Thereafter, Gold Medal would not have a claim to Hopewell's liquidated assets or Hopewell's retained share of the liability, and its only remaining recourse would be an assignment of Hopewell's rights against the retrocessionaires. The parties dispute responsibility for the fact that Gold Medal's claim was not liquidated by the time of the final meeting of

creditors, and the arbitration between Gold Medal and Hopewell has not concluded, even now. Gold Medal does not, however, challenge the fact that it has apparently lost any right under the Scheme to recover against Hopewell for Hopewell's retained portion of the liability.[1]

The Bermuda arbitration panel issued a second interim award, this time on substantive matters, on October 19, 2001. That award, based on Minnesota law, appears to limit Hopewell's maximum liability to General Mills' losses from stock-in-process, rather than finished cereal products, and to reduce Gold Medal's claim against Hopewell from $203 million to a maximum of $78 million. Shortly thereafter, Gold Medal, joined by General Mills, filed a motion in this Court seeking to vacate the 1999 Injunction enforcing the Scheme in the United States. In its motion, brought under Bankruptcy Rule 9024 incorporating Fed.R.Civ.P. 60(b), Gold Medal reasoned that the Bermuda Scheme had been fully carried out, with creditors paid and a surplus distributed to the shareholders, and that there was no bankruptcy purpose to be served by continued enforcement of the Scheme in the United States. Gold Medal further argued that: (i) it was unfairly prejudiced by the 1999 Injunction in that its liability and its corresponding claim against Hopewell—now only a claim against the retrocessionaires—had been finally determined by the Minnesota judgment; (ii) the Bermuda arbitration was still dragging on, with no end in sight, and; (iii) it should be able to proceed with a quick and inexpensive arbitration in Minnesota and then, presumably, bring suit directly against the retrocessionaires in the United States to collect their share of the liability. Such a direct action could not possibly have an impact on Hopewell's estate or its other creditors, in Gold Medal's view.

Gold Medal also argued that the prejudice it suffered was "aggravated" by the fact that Hopewell had paid over its assets to the retrocessionaires, its shareholders, and that the purported assignment of rights against the retrocessionaires was inadequate, *inter alia,* because the retrocessionaires were only severally responsible for their percentage share of Hopewell's liability. Several retrocessionaires had already become insolvent, Gold Medal argued, and it predicted that others would also become insolvent if it could not obtain immediate relief prior to the conclusion of the interminable Bermuda arbitration.[2] Gold Medal also argued that the 1999 Injunction should be modified because the Bermuda Scheme was inherently unfair and prejudicial and was administered for the benefit of Hopewell's shareholders (the retrocessionaires) and not its creditors.

Before Gold Medal's motion was fully briefed or argued, Hopewell sought and obtained from the Bermuda court an injunction restraining Gold Medal and its agents "from taking any step in the proceedings before a United States Bankruptcy Court...seeking to vary or discharge the permanent injunction granted by the said United States Bankruptcy Court on 21 September 1999." This anti-suit injunction would have penalized Gold Medal or precluded it from arguing its motion here. In an opinion dated January 17, 2002, reported at 272 B.R. 396, this Court found that the Bermuda injunction constituted an inappropriate interference with the Court's

---

1. Hopewell's retained share of a liability based on a $203 million claim would apparently be $6.9 million.

2. Based on a liability of $203 million, the share of those retrocessionaires who were insolvent at the time this motion was filed was $14 million, according to Gold Medal.

inherent power to alter or amend its own orders and with its express reservation of the right to do so as a term of the 1999 Injunction. It held that appropriate relief would be to render the 1999 Injunction unenforceable so long as the Bermuda anti-suit injunction remained in effect.[3] In response, the Bermuda Court, acting on Hopewell's application, vacated its anti-suit injunction. The parties thereafter completed the briefing and argument of the instant motion.[4]

## II  Rule 60(b) Relief

■ Gold Medal argues that it is entitled to a modification of the Permanent Injunction under the equitable provisions of Fed.R.Civ.P. 60(b)(5) and (b), incorporated in bankruptcy matters by Bankruptcy Rule 9024. Subsections (5) and (6) of Rule 60(b) provide, in pertinent part:

> "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or a proceeding for the following reasons: . . . (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment."

Gold Medal analogizes the permanent injunction entered by this Court in 1999 to a consent decree and argues that the Court should apply the "flexible standard" for modifications of judgments set forth in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 383, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992). *Rufo* held that a party seeking the modification of a consent decree must show that a significant change in circumstances, either factual or legal, warrants revision of the decree. 502 U.S. at 383, 112 S.Ct. 748. Changed circumstances include conditions that make compliance with the decree "substantially more onerous" or impractical because of unforeseen developments, or where enforcement of the decree would be detrimental to the public interest. 502 U.S. at 383–384, 112 S.Ct. 748.

In addition to the equitable considerations used in *Rufo*, Gold Medal argues that modification would be appropriate because the primary purpose of the decree has been "substantially effectuated," citing *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir.1995), and *Patterson v. Newspaper and Mail Deliverers' Union*, 13 F.3d 33, 38 (2d Cir.) *cert. denied*, 513 U.S. 809, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994). Hopewell asserts that the *Rufo* standard is not applicable in this matter, contending that *Rufo* has limited applica-

---

**3.** This Court also found in its January 2002 decision that the pendency of the appeal in the District Court did not divest it of jurisdiction to decide the motion to modify the 1999 Injunction. *Hopewell III*, 272 B.R. at 404–405. The District Court appeal has since been decided, with a further appeal taken to the Circuit Court. The pendency of a further appeal, however, does not preclude a decision by this Court denying this motion, or a recommendation to the appellate court that the motion be granted. *See id.*, at 404–405, 413.

**4.** Gold Medal notes that the Bermuda Court, in its order vacating the anti-suit injunction,

reserved the power to determine whether Gold Medal should be required to indemnify Hopewell for costs incurred in relation to the anti-suit injunction and for damages arising from Gold Medal's alleged violation of the 1998 Bermuda Injunction. No allegation has been made that Hopewell has attempted to impose any such costs or penalties on Gold Medal or any of Gold Medal's agents, however, and any issues that might arise as a consequence thereof have not been considered in connection with the determination of the instant motion.

tion to (1) consent decrees affecting large numbers of people and (2) cases involving institutional reform. It argues that the Court should use the stricter standard for modifications of injunctions established in *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), a decision that predated Rule 60(b) and required a "grievous wrong" to justify modification of a decree.

Gold Medal's motion seeks to modify an injunction that enforced, in this country, a Scheme of Arrangement, a court-approved decree that resolves an insolvency proceeding and provides for a final distribution of assets, in a manner similar to a plan of reorganization under the Bankruptcy Code. The effect of the injunction enforcing the Bermuda Scheme is "very similar to the effect of confirmation of a plan." *Hopewell I,* 238 B.R. at 59. Under 11 U.S.C. §§ 1144 and 1127(b) a court has limited jurisdiction to revoke an order confirming a plan or to modify a plan after substantial consummation, and Bankruptcy Rule 9024 expressly provides that Rule 60(b) does not override the time allowed in § 1144 for filing a complaint to revoke an order confirming a plan or the time allowed in § 727(e) for filing a complaint to revoke a Chapter 7 discharge. Nevertheless, Rule 60(b) has been used in several bankruptcy cases to relieve a creditor from the operation of a confirmation order. *See, e.g., In re 1115 Third Avenue Rest. Corp.* 185 B.R. 12, 13–14 (S.D.N.Y.1995); *In re Boroff,* 189 B.R. 53, 56 (D.Vt.1995); *In re 401 East 89th Street Owners Inc.,* 223 B.R. 75, 79 (Bankr.S.D.N.Y.1998). In

these cases the motions under consideration were primarily based on Rule 60(b)(6), and accordingly the cases required that the moving party show "exceptional circumstances" in order to justify the relief requested. *See Liljeberg v. Health Services Acquisition Corp.* 486 U.S. 847, 863–864, n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE: Civil 2d § 2857.[5]

Nevertheless, Rule 60(b)(5) has also been used to grant equitable relief from a confirmation order. *In re Midlands Utility, Inc.,* 253 B.R. 683, 689 (Bankr.D.S.C. 2000). In *Hendrix v. Page (Matter of Hendrix),* 986 F.2d 195 (7th Cir.1993), the Seventh Circuit used the flexible standard in *Rufo* and Rule 60(b)(5) in connection with a motion to modify the discharge injunction entered at the conclusion of a Chapter 7 case, which is analogous to a Chapter 11 confirmation order. There, the Court held that: (i) *Rufo* governed in connection with proceedings for a declaration that a discharge injunction should be modified in order to permit a creditor to proceed against a third party, the discharged debtor's insurer; (ii) *Rufo* had given the *"coup de grace "* to *United States v. Swift;* (iii) *Rufo* was applicable in equitable cases other than those involving institutional reform; and (iv) *Rufo* assimilated the correct standard for modifications of judgments under Rule 60(b)(5). 986 F.2d at 198; *see also Protectoseal Company v. Barancik,* 23 F.3d 1184, 1187 (7th Cir.1994).[6]

---

**5.** Rule 60(b)(6) has been described as a "grand reservoir of equitable power" to do justice where "extraordinary circumstances are presented," *Liljeberg v. Health Services Acquisition Corp.* 486 U.S. 847, 863–864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). As discussed below, Gold Medal can base its motion on the more liberal provisions of Rule

60(b)(5), and accordingly, it is not necessary to consider whether it can show the "extraordinary circumstances" required for motions based on Rule 60(b)(6).

**6.** In *Grand Union Equipment Co. v. Lippner,* 167 F.2d 958, 961 (2d Cir.1948), the Second Circuit said, in a Chapter XI case arising

The Second Circuit has not considered the application of Rule 60(b)(5) and *Rufo* in connection with a bankruptcy matter, but it has held that the *Rufo* standard is not limited to institutional reform cases and has applied it in connection with commercial disputes. In *Patterson v. Newspaper & Mail Deliverers' Union,* 13 F.3d at 38, a case that did not involve the government, the Second Circuit found that the *Rufo* standard permitted modification of a decree where the "basic purpose" of the decree had been achieved, *citing Hendrix,* 986 F.2d at 198. In *United States v. Eastman Kodak, Co.,* the Second Circuit held that *Rufo* provided one standard for analyzing whether to modify an antitrust consent decree, and it rejected the *Swift* formulation altogether. 63 F.3d at 102. While it is essential to give confirmation orders a high degree of finality, Gold Medal may properly invoke Rule 60(b)(5) and the *Rufo* standard on this motion.[7]

The movant here actually seeks modification of an order under § 304 enforcing a foreign Scheme rather than a modification of a confirmation order or a discharge injunction, but the courts have held that they also have flexibility to modify orders entered under § 304. Analogizing an injunction entered under § 304 to the automatic stay provided for by § 362 of the Bankruptcy Code, and a motion to amend such an order to a motion for relief from the automatic stay, this Court has held, "[J]ust as the automatic stay may apply to

situations or actions that bear no relationship to its purpose so that the stay should be modified, annulled or conditioned for cause. . .it may be necessary after a § 304 case is filed and relief granted to tinker with that relief to do justice in particular circumstances." *In re Banco Nacional de Obras y Servicios Publicos,* 91 B.R. 661, 664 (Bankr.S.D.N.Y.1988). In that case, the court modified a § 304 injunction entered in favor of a Mexican debtor so as to permit a union to bring suit in the U.S. District Court on the ground that the American court had specific expertise on the issue, and that it would cause the union undue prejudice to force it to proceed in the Mexican courts. 91 B.R. at 668. Similarly, in *In re YMB Magnex International, Inc.,* 249 B.R. 402, 407 (Bankr.E.D.Pa. 2000), the court modified an injunction entered in a § 304 case to permit class action securities litigation to proceed in the United States. *See also In re Empresa de Transportes Aero del Peru, S.A.* 263 B.R. 367, 377 (S.D.Fla.2001).

Accordingly, Gold Medal has properly based its motion on Rule 60(b)(5), and it is appropriate to utilize a flexible approach, such as that set forth in *Rufo* and in the cases cited above modifying § 304 orders, in considering whether to grant relief. Nevertheless, even under a flexible standard, Gold Medal has not justified a modification of the Permanent Injunction.

under the Bankruptcy Act, that the newly adopted provisions of Fed. Rule of Civil Procedure 60(b)(5) could be used to modify a decree entered in a bankruptcy case. At that time Bankruptcy Rule 9024 had not been adopted, and motions to modify decrees in bankruptcy were apparently limited to those affecting third parties or denying a discharge. *See Conway v. Union Bank of Switzerland,* 204 F.2d 603, 609 (2d Cir.1953). Since the adoption of Bankruptcy Rule 9024, Rule 60(b)(5) has clearly been available in other situations.

**7.** Rule 60(b)(5) requires a motion to be brought within a "reasonable time." Despite Hopewell's objection, the motion was brought within a "reasonable time" after the Interim Award was rendered in Bermuda and when it was clear that the Minnesota judgment would not be deemed binding. *See In re Schwinn Bicycle* Co., 248 B.R. 328, 333 (Bankr.N.D.Ill. 2000).

### III   Gold Medal's Grounds for Modifying the Injunction

■   Gold Medal's argument for modification of the 1999 Injunction is principally based on alleged critical changes in the circumstances since 1999, particularly the fact that Hopewell has fully carried out its Scheme of Arrangement, has paid all of its creditors (other than Gold Medal), and has distributed its remaining cash to its shareholders.   Since the purposes for which Hopewell filed an insolvency case have been carried out, Gold Medal contends, there is no reason for maintaining an injunction that can only protect third parties, the retrocessionaires.   On this theory, Gold Medal should not be bound to arbitrate under Bermuda law, as mandated by the Scheme, but should be permitted to go forward based on the Minnesota results. In Gold Medal's view, enforcement of the Minnesota judgment, through a speedy Minnesota arbitration, would entitle Gold Medal to claim against the solvent retrocessionaires their respective shares of an aggregate of approximately $203 million in damages, while its claim based on the Bermuda arbitration may be limited to $78 million or less.[8]

Gold Medal's contention that the 1999 Order should be modified for its benefit because Hopewell has now distributed all of its assets has no merit.   Virtually every insolvency proceeding concludes with a distribution of assets (if there are any) or the equivalent to a distribution of assets, which is the debtor's performance of its obligations under a plan of reorganization or scheme of arrangement.   Nevertheless, it cannot be seriously argued that a discharge injunction or a confirmation order should be vacated merely because the debtor's assets have been fully distributed or the plan substantially consummated. Any such broad principle would deprive the discharge or the plan of the finality to which it is entitled.   While a court may have *power* to modify the 1999 order under Rule 60(b), finality is particularly important in insolvency matters.   As was previously found in this very case, "A plan of reorganization, once confirmed, has preclusive effect."   *Hopewell I*, 238 B.R. at 59, citing *Maxwell Communication Corp. v. Societe Generale (In re Maxwell Communication Corp.)*, 93 F.3d 1036, 1048 (2d Cir.1996) and *Sure–Snap Corp. v. State Street Bank & Trust Co.*, 948 F.2d 869, 873 (2d Cir.1991).   A plan does not lose preclusive effect with respect to the last creditor whose claim is resolved any more than it would with respect to the first.

Gold Medal made a similar argument in the prior proceedings in this Court when it argued that the Bermuda case was no longer a "foreign proceeding" within the meaning of § 304 because the Scheme had already been sanctioned in Bermuda and the court's file closed and sent to storage. Chief Judge Brozman found that argument "ridiculous," stating:

> "Were Gold Medal and General Mills correct that a scheme, once sanctioned, is no longer eligible for our assistance, we would grant ancillary petitions in advance of the sanctioning of schemes of arrangement, but refuse such relief once the schemes had received court approval.   This result would stand the notion of comity on its head by our refusal to grant assistance for the very reason the foreign court had acted."   *Hopewell I*, 238 B.R. at 50.

---

8.   There appears to be no dispute on the record herein that many of the retrocessionaires have already settled directly with Gold Medal and that Gold Medal has collected more than $90 million from the so-called "settling retrocessionaires."   These settlements, however, have no impact on the legal rights of those that have not settled (the "non-settling retrocessionaires") or on the issues raised in this motion.

Gold Medal's argument on this motion stands the principle of finality on its head by suggesting that the last creditor should not be bound by the Scheme that is still in effect in Bermuda, simply because all others have been satisfied and the debtor stripped of all assets.

Gold Medal relies on the principle that a discharge injunction does not bar a creditor from pursuing a liability insurer on a discharged claim where there can be no recovery against the debtor, or that a discharge injunction should be modified to permit such an action against a third party. As noted above, *Hendrix v. Page (Matter of Hendrix),* 986 F.2d at 197, found that Rule 60(b)(5) provided a basis for granting exactly such relief. In *Green v. Welsh,* 956 F.2d 30, 33 (2d Cir.1992), the Second Circuit held that a creditor with a personal injury claim against the former debtor did not even have to seek modification of the permanent injunction to proceed against the debtor's liability insurer. *See also In re Fernstrom Storage and Van Co.,* 938 F.2d 731, 733 (7th Cir.1991); *In re Jet Florida Sys. Inc.,* 883 F.2d 970, (11th Cir.1989); *In re Pettibone Corporation,* 156 B.R. 220, 231 (Bankr.N.D.Ill.1993). These courts have relied on the language of § 524 of the Bankruptcy Code, and the policies of discharge and providing the debtor with a "fresh start" but avoiding the grant of a windfall to third parties, to allow an entity that would not be able to collect on a claim as a personal liability of the debtor to pursue it for the sole purpose of establishing a claim against a liability insurer.[9]

The cases, however, recognize definite limits to the rule that a third party can pursue a claim against an insurer notwithstanding a discharge of any personal liability of the insured debtor. Several decisions of the Second Circuit discuss the extent to which a plan of reorganization can attempt to preserve indemnity insurance rights for the benefit of creditors, where the underlying insurance policy requires that the debtor "pay first." *See In re United States Lines, Inc.,* 197 F.3d 631, 638–39 (2d Cir.1999); compare *Liman v. American S.S. Owners Mut. Protection & Indem. Ass'n,* 299 F.Supp. 106, 108 (S.D.N.Y.), aff'd. 417 F.2d 627 (2d Cir. 1969), with *Dicola v. American S.S. Owners Mut. Protection & Indem. Ass'n (In re Prudential Lines, Inc.),* 158 F.3d 65, 73 (2d Cir.1998). But there is no suggestion in these cases that the creditors could obtain relief to proceed directly against the insurance companies notwithstanding a confirmed plan, and *Dicola* found direct actions against such indemnity insurers to be barred under New York law. 158 F.3d at 74–76.

In *In re Columbia Gas Transmission Corp.,* 219 B.R. 716 (S.D.W.Va.1998), the court refused to extend the rule permitting suit against a liability insurer so as to allow a third party to proceed against an excess insurer, whose contract with the insured provided that liability was not triggered until the insured was "legally obligated to pay" a sum, which was impossible because of the discharge. The court found that the potential liability of the insured debtor was not nominal or non-existent, as in the liability insurance cases, and that the debtor would have to pay the costs of defense. In *Bank of India v. Trendi*

---

**9.** Section 524(a) provides that a discharge operates as an injunction against actions to recover a debt as a "personal liability of the debtor," but subsection (e) provides that such injunction "does not affect the liability of any other party on…such debt." It has been held that this language, taken as a whole, "reveals that Congress sought to free the debtor of his personal obligations while ensuring that no one else reaps a similar benefit." *Green v. Welsh, supra,* 956 F.2d at 33.

*Sportswear, Inc.,* 2002 WL 84631 (S.D.N.Y.2002), the court found that the claimant could not proceed against the discharged debtor on a claim of indemnification because, under New York law, a party seeking indemnification must have an out-of-pocket loss to be reimbursed. *Id.* at *4. The debtor would not be a "nominal" defendant, and, therefore, such a suit would be in violation of the fresh start policy of the Bankruptcy Code. *Id.* at *7.

The decisions that have permitted a creditor to pursue a claim based on a liability insurance policy have also stressed the fact that there would be no cost to the estate. *See In re Jet Florida,* where the Court found that while the burden of the litigation costs could fall on the debtor, "the practical and economic realities compel the insurance company to defend the underlying action," and, in any case, "the debtor would be free to default because the Plaintiff cannot recover directly from the debtor's estate." 883 F.2d at 976.

Although the retrocessionaires are in the business of insurance, they did not provide liability insurance to Hopewell. As previously found in this case, Hopewell's rights against the retrocessionaires are, under the applicable law of New York, accounts receivable, "assets belonging to Hopewell because the right to collect them belongs exclusively to Hopewell, the only entity in privity with the retrocessionaires under the Retrocession Treaties. It is Hopewell that is the holder of the bundle of all rights under the Retrocession Treaties . . . To put it crudely, absent Hopewell, no one gets the money." *Hopewell I,* 238 B.R. at 47–48. In the Scheme the retrocessionaires are described as having contractual obligations to assist Hopewell in paying claims against it in a timely fashion. Scheme § 1.1. Since Gold Medal's claim is only against Hopewell, and Hopewell has only a contractual right against the retro-

cessionaires, Gold Medal cannot rely on the line of cases that permit a third party to proceed against a liability insurer that has contracted to pay claims "on behalf of" the debtor.

There would also be substantial costs to Hopewell, even now, if Gold Medal were permitted to sue the retrocessionaires directly. In *Hopewell I,* Judge Brozman found that if the retrocessionaires became subject to collateral attack outside of the Scheme, they "may refuse to honor their obligations to Hopewell and the scheme would fail." 238 B.R. at 43. Gold Medal argues that it is now the last creditor, that there is no longer need for concern about Hopewell's rights against the retrocessionaires, and that it is willing to take its chances in a direct action. But there would still be direct and indirect costs to Hopewell and its stakeholders if Gold Medal were permitted to proceed directly against the retrocessionaires, including the costs to Hopewell of intervention to protect the Scheme and the costs to the retrocessionaires of the litigation and the charge-back of these costs to Hopewell. Since there is no privity between Gold Medal and the retrocessionaires, Hopewell would inevitably be involved in the dispute. Even absent these costs, the retrocessionaires, who have apparently complied with the Scheme (to date) and paid their obligations to Hopewell, have a right to rely on the finality of the Scheme and its preclusive effect even against Hopewell's last remaining creditor. *In re Maxwell Communication Corp.,* 93 F.3d at 1044–1045; *Sure–Snap Corp. v. State Street Bank & Trust Co.,* 948 F.2d at 873.

It is not uncommon for a plan under Chapter 11 to establish a comprehensive scheme to liquidate claims and allocate insurance coverage that may be limited in amount, supplied by numerous primary and excess carriers with different liabili-

ties, and allocable to hundreds or thousands of creditor claimants. In *In re United States Lines, Inc., supra*, the Second Circuit found that the Bankruptcy Court had authority to nullify arbitration provisions in the debtor's insurance policies when it was necessary to employ an alternative system, a reorganization trust, for the efficient and coordinated resolution of claims against the debtor and the insurers. 197 F.3d at 639–41. *See also Anderson v. Dalkon Shield Claimants Trust (In re A.H. Robins Co., Inc.)*, 42 F.3d 870, 874–75 (4th Cir.1994). In *MacArthur Company v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, 93 (2d Cir.1988), the Court held that it was within the Bankruptcy Court's authority to enjoin actions, approve settlements between the debtor and its insurers, and then require the debtor's creditors to look to the proceeds of the settlement for any recovery. 837 F.2d at 92–93. No exception was made in either *United States Lines* or *MacArthur* for the "last creditor's claim." Since the Bermuda Scheme, here, expressly preserves to Gold Medal (and all other insureds) Hopewell's rights against the retrocessionaires after claims are liquidated, and thus provides a system for the preservation of rights against the retrocessionaires rather than an elimination of those rights, Gold Medal cannot complain that it is unfairly prejudiced by this aspect of the Scheme or cite any United States bankruptcy policy that would be offended.

Gold Medal contends, "The question for this Court is which process—Bermuda or Minnesota arbitration—is more equitable." (Second Reply Memo of Law at 4.) The real question on this motion to modify the 1999 Injunction is whether there have been any changes in the facts or the law since its entry that would justify disturbing the conclusion of this Court, affirmed by the District Court, that the provision of the Scheme providing for a uniform arbitration procedure in Bermuda under Bermuda law is entitled to be enforced in this country. There have been none cited by Gold Medal or General Mills.[10]

## IV Alleged Maladministration of the Scheme.

■ Gold Medal's second argument for modifying the 1999 Injunction centers on developments in the administration of the Scheme since 1999 and the 2001 decision of the Second Circuit in *Bank of New York v. Treco (In re Treco)*, 240 F.3d 148 (2d Cir.2001). *Treco* vacated an order under § 304 that granted recognition to a Bahamian insolvency proceeding and remitted U.S. assets abroad on the ground, among others, that extraordinarily high costs of administration would be charged against the assets and would divest the objecting United States creditor of its collateral. *Treco* requires a bankruptcy court to en-

---

**10.** Gold Medal also argues that the Bermuda arbitration is dragging on interminably and contends that it should be allowed to establish Hopewell's liability in a speedy Minnesota arbitration. Both parties appear to share responsibility for the delay. In any event, the Bermuda arbitration has been advancing steadily for several years and the panel is familiar with the issues and approaching a final decision. A court must administer § 304 relief, "being guided by what will best assure an economical and expeditious administration of [the foreign] estate." 11 U.S.C.

§ 304(c). There is no clear indication today that a Minnesota arbitration would be faster and more economical than the proceedings in Bermuda, or that the commencement of a new arbitration in Minnesota would not "create a wasteful and unnecessary obstacle to the economic and expeditious administration" of the proceedings. *YMB Magnex*, 249 B.R. at 411. Moreover, the District Court specifically found that "there is no reason to doubt that the arbitration proceeding in Bermuda will be 'fair, impartial, procedurally sound, and free from fraud.'" *Hopewell II*, 275 B.R. at 709.

gage in a searching examination of the effects of a foreign insolvency proceeding on the individual rights of United States creditors before entering a § 304 order. 240 F.3d at 158; *cf. In re Compania General de Combustibles,* 269 B.R. 104, 111–13 (Bankr.S.D.N.Y.2001). *Treco* was obviously not decided when Chief Judge Brozman entered the 1999 Injunction, and although it was available to and cited by District Judge Chin when he affirmed the 1999 Injunction, *Hopewell II,* 275 B.R. at 703, 705, 708–709, Gold Medal implies that it is an intervening decision that, taken together with developments since 1999, justifies modification of the 1999 Injunction.[11]

The developments adverted to by Gold Medal include the following. First, Gold Medal alleges that, in 2001, Hopewell effected a final distribution of all of its cash to its other creditors and its shareholders (the retrocessionaires). Gold Medal notes that this was contrary to what Chief Judge Brozman assumed in her 1999 opinion, when it appeared likely that Hopewell would "pay creditors in full with interest." *Hopewell I,* 238 B.R. at 55–56, 63. Gold Medal adds that a distribution to shareholders prior to creditors would violate the absolute priority rule recognized by the United States Bankruptcy Code, *cf. Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), and that the Scheme accordingly fails to meet the requirement of § 304(c)(3) that the distribution of proceeds be substantially in accordance with United States law. *See Treco,* 240 F.3d at 158–159.

On this motion to modify the 1999 Injunction and relieve Gold Medal from the Scheme, the fact that it will not receive any payment on Hopewell's retained liability for its claim, whereas Hopewell's shareholders will receive a payment, does not constitute a sufficient change in circumstances to entitle Gold Medal to relief. Judge Brozman recognized that Hopewell's creditors might not be paid in full and that Gold Medal might have to rely on the alternative remedies provided for in the Scheme if its claims were not liquidated by the cut-off date of June 30, 2001. *Hopewell I,* 238 B.R. at 37. The Bankruptcy Code itself recognizes the need for a final cut-off date in reorganization cases by providing for the estimation of contingent or unliquidated claims, "the fixing or liquidation of which, as they case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). The Code also requires the complete disallowance of "claims for reimbursement or contribution if still contingent at the time of allowance or disallowance." 11 U.S.C. § 502(e)(1)(B).

Moreover, as discussed above, Gold Medal does not directly attack the fact that Hopewell has under the Scheme paid all other creditors and shareholders but has not reserved any cash to pay its claim. In Gold Medal's words, "[t]he Scheme has benefitted all parties in interest other than Gold Medal. *Gold Medal does not seek to disturb those benefits...* ". (Gold Medal Mem. 11/19/01, at 9 *(emphasis added)*.) The reason for Gold Medal's position is obvious. The Scheme has a relatively small impact on Gold Medal as a result of its inability to collect Hopewell's retention or even the percentage shares of the insolvent retrocessionaires. *See supra,* notes 1 and 6. Gold Medal's real loss results from its being locked into the Bermuda arbitration and being entitled to claim against the non-settling retrocessionaires on the basis

---

11. This Court suggested in *Hopewell III,* which was written before the District Court's decision, that it might be necessary to review Gold Medal's allegations against the *Treco* standard. 272 B.R. at 411, n. 19.

of their respective shares of a liability of $78 million or less, rather than $203 million. Nevertheless, as discussed above, Gold Medal has not shown grounds to modify the requirement of the 1999 Injunction that it arbitrate with Hopewell in Bermuda under Bermuda law.

Gold Medal further charges that the controlling directors of Hopewell were all retrocessionaires who violated their fiduciary duties under Bermuda law in their zeal to diminish or, if possible, eliminate Gold Medal's claim so as to avoid any liability themselves. "Gold Medal," it asserts, "has been forced to play against a stacked deck." (Gold Medal Mem. 3/19/02 at 7.) In particular, Gold Medal argues that Hopewell and its Board knew before June 30, 2001 that their own experts valued Gold Medal's claim as at least $78 million, and that a claim of this size would render Hopewell insolvent, preclude it from making a final distribution under the Scheme, and require it to go into a voluntary or involuntary winding up, where it would distribute its assets to all creditors *pari passu*. Gold Medal alleges that Hopewell's directors breached their fiduciary duties under Bermuda law when they ignored these facts and preferred their own interests as shareholders to the interests of Hopewell's creditors. (Gold Medal Mem. 3/19/02 at 17–19.)

The record is clear, however, that Gold Medal asked the Bermuda court for an adjournment of the date of the final meeting and that when its petition was rejected, it filed and then withdrew a notice of appeal. Gold Medal asserts that it was induced by Hopewell to withdraw its notice of appeal for strategic purposes, an assertion that Hopewell denies. In any event, this Court cannot properly serve as an appellate court on an issue involving whether Bermuda directors violated Bermuda law when they refused to adjourn a

meeting of creditors or postpone a distribution of assets provided for in a confirmed Scheme. *See Hopewell I*, where the Court found, in a similar attack on the Scheme, "this is not the proper forum for a belated and disguised appeal," citing *In re Gee*, 53 B.R. 891, 902 (Bankr.S.D.N.Y. 1985). Both the District Court and Bankruptcy Court found in this case that the Bermuda Court has remained available to resolve disputes and review actions by the Scheme administrators. *Hopewell II*, 275 B.R. at 707; *Hopewell I*, 238 B.R. at 49.

In determining whether to recognize a foreign proceeding under § 304, it is the duty of the U.S. court to examine the factors set forth in the statute as well as the impact of the foreign proceeding on the rights of U.S. creditors. *Treco*, 240 F.3d at 158. The doctrine of comity also requires a U.S. court to apprise itself of the nature of a foreign judicial proceeding and whether "fundamental standards of procedural fairness" have been complied with by the foreign court. *Cunard Steamship Company Ltd. v. Salen Reefer Servs.*, 773 F.2d 452, 457 (2d Cir.1985); *Treco*, 240 F.3d at 157–158; *see also Empresa de Transportes Aero del Peru, S.A.*, 263 B.R. 367, 377 (S.D.Fla.2001). Neither *Treco* nor traditional notions of comity, however, require a U.S. court to make an independent determination as to whether foreign directors breached foreign law when the objecting U.S. creditor received a hearing abroad. "A foreign judgment may not be attacked 'upon the mere assertion of the party that the judgment was erroneous in law or in fact.'" *Clarkson Co. Ltd. v. Shaheen*, 544 F.2d 624, 631 (2d Cir.1976), quoting *Hilton v. Guyot*, 159 U.S. 113, 203, 16 S.Ct. 139, 40 L.Ed. 95 (1895); *see In re Maxwell Communication Corp.*, 93 F.3d at 1047 ("International comity…may be viewed as a discretionary act of deference by a national court to decline to exercise

jurisdiction in a case properly adjudicated in a foreign state, the so-called comity among courts."); *see also In re Axona International Credit & Commerce Ltd.*, 88 B.R. 597, 612 (Bankr.S.D.N.Y.), *aff'd*, 115 B.R. 442 (S.D.N.Y.1990), *appeal dismissed*, 924 F.2d 31 (2d Cir.1991) (to require a Chapter 7 trustee to review *de novo* the Hong Kong Liquidator's determination would be inconsistent with the Code's mandate that a case be conducted in the most "economical and expeditious fashion"). As the District and Bankruptcy Courts both stated in this matter, one of the purposes of § 304 is to encourage "deference to the country where the primary insolvency proceeding is located," *Hopewell II*, 275 B.R. at 705, and *Hopewell I*, 238 B.R. at 54, both quoting *Hong Kong and Shanghai Banking Corp. v. Simon (In re Simon)*, 153 F.3d 991, 998 (9th Cir.1998), *cert. denied*, 525 U.S. 1141, 119 S.Ct. 1032, 143 L.Ed.2d 41 (1999); *see also Esteve Sales v. Manning (In re Manning)*, 236 B.R. 14, 26 (9th Cir. BAP 1999).

■ As further evidence of Hopewell's wrongdoing, Gold Medal raises two issues relating to the assignment to it of Hopewell's claims against the retrocessionaires. Since Hopewell has paid over all of its cash to its other creditors and shareholders, the right to an assignment of claims against the retrocessionaires is now an essential part of the Hopewell Scheme as far as Gold Medal is concerned. Without an effective assignment, Gold Medal will have no rights at all to any recovery in respect of its claim against Hopewell. Under *Treco*, the effectiveness of the assignment of claims provided for in the Scheme may be an essential condition to the enforcement of the Scheme in the United States. 240 F.3d at 159–160.

Gold Medal's first contention relating to the assignment of claims against the retrocessionaires is that Hopewell has refused its request for an unconditional assignment and has demanded that the assignment be governed by Bermuda law and contain an indemnity running in Hopewell's favor. The right to an assignment emanates from the Scheme, which provides that Hopewell "shall upon the written request of a Scheme Creditor assign all of its rights against the retrocessionaires in respect of that Scheme Creditor's claim to or to the order of the Scheme Creditor concerned." Scheme, §§ 3.15, 3.6, and 5.2.2. Since this is a matter of enforcement and construction of the Scheme and specifically requires the interpretation of Bermuda law, no sufficient reason has been shown to explain why the Bermuda Court would not be the proper forum for the adjudication of any continuing dispute concerning the form of the assignment. *See In re Maxwell Communication Corp.*, 93 F.3d at 1051–53.

Gold Medal's second issue arises from the fact that the three largest retrocessionaires, who hold approximately 87% of the aggregate exposure of the non-settling retrocessionaires, took the position through counsel that the assignment of Hopewell's rights, without their consent, is in violation of Bermuda law and unenforceable.

There was no basis for this Court, on the record on this motion, to assume that the assignment would be ineffective to bind the solvent non-settling retrocessionaires to their share of a final arbitral award in favor of Gold Medal. Hopewell's counsel reiterated on oral argument that his client stands behind the assignment, believes that it is in accord with Bermuda law and is committed to making it effective.[12] In any event, the Court has re-

---

**12.** Hopewell stated in one of its submissions to this Court that it gave an undertaking to

the Bermuda court that it would take no steps to wind itself up until a final award was

ceived a post-argument submission that the three recalcitrant retrocessionaires have agreed to be bound by the assignment provided for in the Scheme. If any of the U.S.-based retrocessionaires are able to avoid liability under the assignment and subvert the Scheme—from which they benefitted and which, as Hopewell's directors and controlling shareholders, they presumably induced this Court to enforce—there would be time for this or another court of appropriate jurisdiction to consider proper relief.

Gold Medal's motion to modify or amend the 1999 Injunction is accordingly denied. Hopewell shall settle an order.

entered in the dispute with Gold Medal. According to Hopewell, this was to address Gold Medal's concerns that Hopewell would be dissolved before a final award was made and Gold Medal would have to establish the extent of Hopewell's liability in separate proceedings against the retrocessionaires. In any event, it is assumed that the assignment of Hopewell's rights against the retrocessionaires will be issued and effective prior to Hopewell's dissolution.